No. 23-60037

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

R.J. REYNOLDS VAPOR COMPANY, ET AL.,

*Petitioners*,

v.

U.S. FOOD AND DRUG ADMINISTRATION, ET AL.,

*Respondents.*

On Review from Order of the Food and Drug Administration Denying Premarket
Tobacco Product Applications PM0000637 (Vuse Vibe) and PM0000713 (Vuse Ciro)

## MOTION FOR A STAY PENDING REVIEW

Noel J. Francisco
Christian G. Vergonis
Ryan J. Watson
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Tel: 202-879-3939
nfrancisco@jonesday.com
cvergonis@jonesday.com
rwatson@jonesday.com

*Counsel for Petitioners*

## CERTIFICATE OF INTERESTED PERSONS

**No. 23-60037, R.J. Reynolds Vapor Company, et al. v. Food and Drug Administration, et al.**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Petitioners R.J. Reynolds Vapor Company ("RJRV") and RJR Vapor Company LLC are direct, wholly owned subsidiaries of RAI Innovations Company; RAI Innovations Company is a direct, wholly owned subsidiary of Reynolds American Inc.; and Reynolds American Inc. is an indirect, wholly owned subsidiary of British American Tobacco, p.l.c., a publicly traded company.

2. RAI Innovations Company is a direct, wholly owned subsidiary of Reynolds American Inc.; and Reynolds American Inc. is an indirect, wholly owned subsidiary of British American Tobacco, p.l.c., a publicly traded company.

3. Reynolds American Inc. is an indirect, wholly owned subsidiary (via holding companies) of British American Tobacco, p.l.c., a publicly traded company.

4. British American Tobacco, p.l.c., is a publicly traded company.

5. Black Rock Inc. is the only publicly traded corporation that owns 5% or more of the outstanding shares of British American Tobacco, p.l.c.

6. Petitioner Mississippi Petroleum Marketers and Convenience Stores Association

is a nonprofit, statewide trade association of petroleum marketers and convenience store operators. It is incorporated in Mississippi. It has no parent company and no publicly traded corporation owns stock in the Association. The Association has approximately 200 retail members, some of whom are interested in the outcome of this litigation. *See* 5th Cir. R. 28.2.1 ("If a large group of persons or firms can be specified by a generic description, individual listing is not necessary.").

7.  Petitioner Avail Vapor Texas LLC is a corporation incorporated in Texas. Its parent corporation is Avail Vapor LLC, a Virginia corporation.

8.  Avail Vapor LLC is a Virginia corporation.

9.  Respondent United States Food & Drug Administration is a federal agency.

10. Respondent Robert Califf, the Commissioner of the United States Food & Drug Administration, has been delegated authority to administer the Tobacco Control Act, including the Act's premarket-review provisions. *See* 2016 FDA Staff Manual Guide § 1410.10(1)(A)(1) (Nov. 29, 2022), https://tinyurl.com/2u7edjen.

11. Respondent United States Department of Health and Human Services is a federal agency.

12. Respondent Xavier Becerra, Secretary of the United States Department of Health and Human Services, is the federal official responsible for issuing orders on premarket tobacco product applications. 21 U.S.C. § 387j(c); 21 U.S.C. § 321(d).

13. The order on review potentially impacts the financial interests of the tobacco industry as a whole, including manufacturers, distributors, retailers, and consumers.

Such entities may include, among others, other applicants that filed applications pursuant to 21 U.S.C. § 387j with the FDA.

The parties and their counsel are:

| Petitioners | Counsel |
|---|---|
| R.J. Reynolds Vapor Company | Noel J. Francisco<br>Christian G. Vergonis<br>Ryan J. Watson<br>JONES DAY<br>51 Louisiana Ave., NW<br>Washington, DC 20001<br>Tel: 202-879-3939<br>nfrancisco@jonesday.com<br>cvergonis@jonesday.com<br>rwatson@jonesday.com |
| RJR Vapor Company, LLC | Noel J. Francisco<br>Christian G. Vergonis<br>Ryan J. Watson<br>JONES DAY<br>51 Louisiana Ave., NW<br>Washington, DC 20001<br>Tel: 202-879-3939<br>nfrancisco@jonesday.com<br>cvergonis@jonesday.com<br>rwatson@jonesday.com |
| Mississippi Petroleum Marketers and Convenience Stores Association | Noel J. Francisco<br>Christian G. Vergonis<br>Ryan J. Watson<br>JONES DAY<br>51 Louisiana Ave., NW<br>Washington, DC 20001<br>Tel: 202-879-3939<br>nfrancisco@jonesday.com<br>cvergonis@jonesday.com<br>rwatson@jonesday.com |

Avail Vapor Texas LLC

Noel J. Francisco
Christian G. Vergonis
Ryan J. Watson
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Tel: 202-879-3939
nfrancisco@jonesday.com
cvergonis@jonesday.com
rwatson@jonesday.com

**Respondents**

**Counsel**

United States Food and Drug
Administration

Noah T. Katzen
U.S. Department of Justice
Civil Division, Consumer
Protection Branch
450 Fifth Street, NW
Washington, DC 20530
Noah.t.katzen@usdoj.gov

Hilary K. Perkins
U.S. Department of Justice
Civil Division, Consumer
Protection Branch
450 Fifth Street, NW
Washington, DC 20530
Hilary.k.perkins@usdoj.gov

Robert Califf, in his official
capacity as Commissioner of
the United States Food & Drug
Administration

Noah T. Katzen
U.S. Department of Justice
Civil Division, Consumer
Protection Branch
450 Fifth Street, NW
Washington, DC 20530
Noah.t.katzen@usdoj.gov

Hilary K. Perkins
U.S. Department of Justice
Civil Division, Consumer
Protection Branch

<table>
<tr><td></td><td>450 Fifth Street, NW<br>Washington, DC 20530<br>Hilary.k.perkins@usdoj.gov</td></tr>
<tr><td>United States Department of<br>Health and Human Services</td><td>Noah T. Katzen<br>U.S. Department of Justice<br>Civil Division, Consumer<br>Protection Branch<br>450 Fifth Street, NW<br>Washington, DC 20530<br>Noah.t.katzen@usdoj.gov<br><br>Hilary K. Perkins<br>U.S. Department of Justice<br>Civil Division, Consumer<br>Protection Branch<br>450 Fifth Street, NW<br>Washington, DC 20530<br>Hilary.k.perkins@usdoj.gov</td></tr>
<tr><td>Xavier Becerra, in his official<br>capacity as Secretary of the<br>United States Department of<br>Health and Human Services</td><td>Noah T. Katzen<br>U.S. Department of Justice<br>Civil Division, Consumer<br>Protection Branch<br>450 Fifth Street, NW<br>Washington, DC 20530<br>Noah.t.katzen@usdoj.gov<br><br>Hilary K. Perkins<br>U.S. Department of Justice<br>Civil Division, Consumer<br>Protection Branch<br>450 Fifth Street, NW<br>Washington, DC 20530<br>Hilary.k.perkins@usdoj.gov</td></tr>
<tr><td>Dated: February 1, 2023</td><td>Respectfully submitted,<br><br>*/s/ Noel J. Francisco*<br>Noel J. Francisco<br>*Counsel of Record for Petitioners*</td></tr>
</table>

Certificate 5

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................... 3

    A.   Vuse Vibe ............................................................................................................ 3

    B.   FDA's regulatory quagmire ............................................................................ 5

    C.   FDA grants tobacco-flavored Vuse Vibe, but denies menthol ...................... 8

ARGUMENT ................................................................................................................. 10

I.     PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS ......................................... 11

    A.   Petitioners are likely to succeed for the reasons identified in *Wages* ............ 12

    B.   Petitioners are also likely to succeed because FDA unlawfully
        created a "tobacco product standard" ............................................................. 19

II.    PETITIONERS FACE IRREPARABLE HARM .................................................................. 22

III.  THE REMAINING FACTORS FAVOR A STAY ................................................................ 23

REQUESTED RELIEF .................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Bidi Vapor LLC v. FDA*,
   47 F.4th 1191 (11th Cir. 2022) ...............................................................*passim*

*Bidi Vapor LLC v. FDA*,
   No. 21-13340-DD (11th Cir. Feb. 1, 2022).................................................2

*Campaign for S. Equality v. Bryant*,
   773 F.3d 55 (5th Cir. 2014) .....................................................................10

*Dennis Melancon, Inc. v. New Orleans*,
   703 F.3d 262 (5th Cir. 2012) ...................................................................22

*DHS v. Regents*,
   140 S. Ct. 1897 (2020)..............................................................................15

*Emerald City Mgmt. v. Kahn*,
   624 F. App'x 223 (5th Cir. 2015) (per curiam)........................................22

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021)..............................................................................14

*Logic Tech. Dev. LLC v. FDA*,
   No. 22-3030 (3d Cir. Dec. 15, 2022) .........................................................2

*Mayor of Baltimore v. Azar*,
   973 F.3d 258 (4th Cir. 2020) (en banc) ...................................................15

*Med-Cert Home Care v. Azar*,
   365 F. Supp. 3d 742 (N.D. Tex. 2019).....................................................10

*Nicopure Labs, LLC v. FDA*,
   944 F.3d 267 (D.C. Cir. 2019) .................................................................12

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................................23

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013)..................................................................24

*Shell Offshore Inc. v. Babbitt*,
   238 F.3d 622 (5th Cir. 2001) ...................................................................19

*Siddiqui v. Holder*,
   670 F.3d 736 (7th Cir. 2012) ...................................................................15

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ...................................................................10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Wages & White Lion Invs., LLC v. FDA,*
  16 F.4th 1130 (5th Cir. 2021)................................................................*passim*

*Wages & White Lion Invs., LLC v. FDA,*
  41 F.4th 427 (5th Cir. 2022) .................................................... 2, 20

*Wages & White Lion Invs., LLC v. FDA,*
  No. 21-60766, 2023 WL 312977 (5th Cir. Jan. 19, 2023) ............................2

*Wildmon v. Berwick Universal Pictures,*
  983 F.2d 21 (5th Cir. 1992) (per curiam) ........................................10

## STATUTES AND RULES

5 U.S.C. § 705 ...................................................................................2

Food, Drug, and Cosmetic Act (FDCA)

  FDCA § 907, 21 U.S.C. § 387g.........................................................19

  FDCA § 910, 21 U.S.C. § 387j..........................................................5

  FDCA § 912, 21 U.S.C. § 387*l*.........................................................2

5th Cir. R. 27.3 ................................................................................24

## REGULATORY MATERIALS

FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems*
  (rev. Apr. 2020) .......................................................................14, 17, 20

FDA*, FDA Announces Comprehensive Regulatory Plan to Shift Trajectory of
  Tobacco-Related Disease, Death* (July 27, 2017) ......................................4

FDA, *Model Technical Project Lead* (Sept. 16, 2021)..................................5

FDA, *Modifications to Compliance Policy for Certain Deemed Tobacco Products*
  (Mar. 2019)................................................................................17

FDA, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery
  Systems (ENDS)* (June 2019) ......................................................... 6, 12

FDA, *Premarket Tobacco Product Marketing Granted Orders* (Apr. 5, 2022)..........................21

FDA, Press Release, *FDA Issues Marketing Denial Orders to Fontem US for
  myblu Products* (Apr. 8, 2022) ........................................................21

FDA, *Technical Project Lead (TPL) Review of PMTA,
  PM0000491, PM0000492* (Dec. 4, 2018) .........................................16

FDA, *TPL Review of PMTAs* (Apr. 2020) ..........................................9

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Regulations.gov, *Deeming Draft RIA as Submitted to OMB* ..................................................20

Regulations.gov, *Deeming Rule Final Rule Redline Changes* ...................................................20

Tobacco Product Standard for Menthol in Cigarettes,
    87 Fed. Reg. 26,454 (proposed May 4, 2022) ....................................................... 17, 20

**OTHER AUTHORITIES**

Associated Press, *Insider Q&A: FDA Official on Vaping's "Promise or Peril,"*
    (Sept. 26, 2022)........................................................................................................................5

Allison Boughner, *FDA Stakeholders Break Their Silence,*
    World Vapers' Alliance (Nov. 15, 2022) .........................................................................8

C-SPAN, *FDA Commissioner on E-Cigarettes and Public Health Concerns*
    (Sept. 25, 2018)........................................................................................................................5

Maria Cooper, et al., *Notes from the Field: E-cigarette Use Among Middle
    and High School Students—United States, 2022* (Oct. 2022) ..................................... 14, 15

Christina Jewett, *F.D.A. Seeks Outside Review of Troubled Food and
    Tobacco Units*, N.Y. Times, July 20, 2022 .........................................................................8

Letter from U.S. Office of Special Counsel to the President
    (Dec. 15, 2022) ........................................................................................................................8

Jim McDonald, *FDA Denies PMTAs for 300,000 More Flavored E-Liquids*,
    Vaping360 (Sept. 3, 2021) ....................................................................................................21

Alex Norcia, *Memos Show FDA Overruled Science-Office Call to OK Menthol
    Vapes*, Filter (Dec. 14, 2022) ................................................................................7, 8, 17, 21

Royal College of Physicians, *Nicotine Without Smoke: Tobacco Harm
    Reduction. London: Royal College of Physicians* (2016) .........................................................5

Natasha A. Sokol, *High School Seniors Who Used E-Cigarettes May Have
    Otherwise Been Cigarette Smokers: Evidence From Monitoring the Future
    (United States, 2009-2018)*, Nicotine & Tobacco Rsch. (2021) ....................................18

Lindsey Stroud, *According to Data from the CDC, Youth Vaping
    Has Not Led to Smoking*, Townhall (Sept. 22, 2021) .....................................................18

Teresa W. Wang, et al., *E-cigarette Use Among Middle and
    High School Students—United States, 2020* (Sept. 2020)........................................... 14, 15

## INTRODUCTION

As this Court previously concluded, FDA has flouted administrative law in reviewing premarket tobacco product applications for e-cigarettes. FDA did so again in denying the application submitted by R.J. Reynolds Vapor Company ("RJRV") for its menthol-flavored Vuse Vibe e-cigarettes. FDA's denial order also undermines its mission to protect public health. If not stayed, FDA's order will force off the market a product that has been available for almost seven years as a potentially less risky alternative to combustible cigarettes. Indeed, FDA has long recognized the valuable role e-cigarettes play in transitioning adult smokers from cigarettes. But FDA's order, if not stayed, will force menthol Vuse Vibe—which has been sold for years—off the market.[1]

New tobacco products need FDA's authorization. Here, FDA's process resulted in millions of simultaneous applications—exponentially more than FDA expected—before FDA had promulgated a regulation governing applications. Compounding the problem, politically driven outcomes began dictating putatively science-based decisions. While trying to change the tires on this moving regulatory car, FDA committed numerous errors in violation of the Administrative Procedure Act ("APA") and the Tobacco Control Act ("TCA").

---

[1] FDA also denied an application for menthol Vuse Ciro. Petitioners do not currently seek a stay as to that product because Petitioners recently stopped selling it. A02-03.

FDA's order as to menthol Vuse Vibe should not stand. Under binding precedent, Petitioners are entitled to a stay. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1134 (5th Cir. 2021).[2] *Wages* explained that FDA violated the APA by ignoring Wages' marketing plan, Wages' reliance interests, less-disruptive alternatives, and other important issues. FDA committed those same errors—and others—in denying menthol Vuse Vibe. Likewise, Petitioners face the same sort of irreparable harm as Wages. Menthol Vuse Vibe has been sold since 2016. FDA's order torpedoes approximately ███████ of RJRV's annual revenue and exacts economic harm on the other petitioners. Petitioners cannot recover these losses due to sovereign immunity. And like in *Wages*, a stay will harm neither FDA nor the public. FDA has taken more than two years to rule on menthol Vuse Vibe. FDA's turtle-speed process proves there will be no harm if the status quo is preserved for a short while. *Wages* thus mandates a stay here.[3]

Accordingly, Petitioners request a stay as to menthol Vuse Vibe to preserve the status quo pending this Court's resolution of their petition. *See* 21 U.S.C. § 387*l*(b); 5 U.S.C. § 705.

---

[2] Other courts have stayed denial orders. *E.g.*, *Bidi Vapor LLC v. FDA*, No. 21-13340-DD (11th Cir. Feb. 1, 2022) (staying e-cigarette denial), 47 F.4th 1191 (11th Cir. 2022) (merits decision); *Logic Tech. Dev. LLC v. FDA*, No. 22-3030 (3d Cir. Dec. 15, 2022) (staying menthol e-cigarette denial).

[3] The 2-1 merits decision in *Wages* has been vacated. *See* 2023 WL 312977 (5th Cir. Jan. 19, 2023). In any event, that decision was wrong and should be corrected en banc. *See* 41 F.4th 427, 442 (5th Cir. 2022) (Jones, J., dissenting).

## BACKGROUND

### A. Vuse Vibe

RJRV introduced Vuse-brand products in 2013. Vuse e-cigarettes are cartridge-based: a power unit heats cartridges containing e-liquid creating an inhalable aerosol. There are four lines of Vuse: Solo, Vibe, Ciro, and Alto.

 

 

A03-04. RJRV sells tobacco- and menthol-flavored versions, though it recently stopped selling all Vuse Ciro. A02-03.

E-cigarettes are critical to tobacco-harm reduction. Then-FDA Commissioner Gottlieb declared: "Envisioning a world…where adults who still need or want nicotine could get it from alternative and less harmful sources, needs to be the cornerstone of our efforts."[4] "[N]icotine…is delivered through products that represent a continuum of risk." *Id.* Relative to cigarettes, e-cigarettes are far down on that continuum. The Director of FDA's Center for Tobacco Products ("CTP"), Brian King, recently

---

[4] FDA*, FDA Announces Comprehensive Regulatory Plan to Shift Trajectory of Tobacco-Related Disease, Death* (July 27, 2017), https://tinyurl.com/28m42939.

explained, "[E]-cigarettes…have markedly less risk than a combustible cigarette product."[5] They are potentially 95% less harmful.[6] FDA's Commissioner said, "[i]f you could take every adult smoker and fully switch them to [e-cigarettes], that would have a substantial public health impact."[7]

### B. FDA's regulatory quagmire

**1.** The TCA requires manufacturers of certain "new" tobacco products (those not marketed as of 2007) to submit to FDA a premarket tobacco product application. 21 U.S.C. § 387j. The standard for authorization is whether marketing the product is "appropriate for the protection of the public health." § 387j(c)(2).

**2.** In its 2016 Deeming Rule, FDA deemed e-cigarettes subject to the TCA. *Wages*, 16 F.4th at 1134. Thus, federal law "prohibited the marketing of e-cigarettes" without premarket authorization. *Id.* This created a "problem because, by the time…FDA got around to issuing the Deeming Rule, manufacturers were widely marketing e-cigarettes." *Id.* FDA therefore delayed enforcement of the review requirements to afford itself time to implement an authorization pathway. *Id.*

---

[5] Associated Press, *Insider Q&A: FDA Official on Vaping's "Promise or Peril,"* (Sept. 26, 2022), https://tinyurl.com/26szanjw.

[6] Royal College of Physicians, *Nicotine Without Smoke: Tobacco Harm Reduction. London: Royal College of Physicians* (2016), https://tinyurl.com/d7y4hna7. FDA recognizes its "review…extends to…existing scientific literature." FDA, *Model Technical Project Lead* 5 (Sept. 16, 2021), https://tinyurl.com/j9aftw4d; *see also* 21 U.S.C. § 387j(c)(2); A89.

[7] C-SPAN, *FDA Commissioner on E-Cigarettes and Public Health Concerns*, at 10:25 (Sept. 25, 2018), https://tinyurl.com/mujce8hr.

**3.** "[F]ollowing the Deeming Rule,…FDA moved its regulatory goalposts." *Id.*

*First*, FDA "changed its mind" about what was required for applications. *Id.* at 1135. "Initially,…FDA's guidance stated that 'in general, FDA does not expect that applicants will need to conduct long-term studies to support an application.'" *Id.*[8] FDA said manufacturers could rely on other sources, such as "existing longer duration studies in the public literature [on similar products]…and extrapolating from short-term studies." PMTA Guidance 13. FDA also suggested manufacturers could choose similar products for comparison, as long as those products were ones consumers would "consider[] interchangeable" and were likely to be "used in a similar manner." *Id.* at 13-14. Then, FDA reversed course "and required the very thing it said it would not— namely, long-term studies of e-cigarettes." *Wages*, 16 F.4th at 1135. Not only that— FDA's denial order here also required those long-term studies to (1) be product-specific, and (2) use tobacco-flavored e-cigarettes as the comparator. A83-84. Worse, when FDA informed RJRV of this new requirement in a deficiency letter, FDA lulled RJRV into believing that that requirement applied *only* to Vuse Vibe's "flavored products (*other than menthol*)." A39 (emphasis added). FDA stated that those other-flavor applications were deficient because they did not show that those products "increase[d] the likelihood of complete switching among adult smokers relative to tobacco or

---

[8] *See also* FDA, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems (ENDS)* 13 (June 2019) ("PMTA Guidance"), https://tinyurl.com/3rmz9ab4.

menthol-flavored [e-cigarettes]." A39. However, FDA never mentioned that evidence needed to take the form of long-term studies. Regardless, in the almost-three years the menthol application was pending, FDA never told RJRV of a similar deficiency for menthol-flavored Vuse Vibe. A16.

*Second*, before the application deadline, FDA "consistently recognized that [an applicant's] marketing and sales-access-restriction plans are relevant" to FDA's decisions. *Bidi*, 47 F.4th at 1203. After the deadline, FDA abandoned that theory and routinely denied applications without considering marketing plans. *Id.* at 1203-04.

*Third*, the CTP Director overruled the Office of Science's decision to grant marketing authorization for menthol-flavored e-cigarettes. According to FDA memoranda, after an extensive review, the Office of Science concluded: "as long as menthol-flavored cigarettes remain on the market, menthol-flavored e-cigarettes could be a direct substitute for them, providing a less harmful alternative for menthol-flavored cigarette smokers."[9] While the Office "acknowledged that menthol-flavored [e-cigarettes] appeal to youth," that appeal "may not be at the same level as some other flavors." *Id.*

---

[9] Alex Norcia, *Memos Show FDA Overruled Science-Office Call to OK Menthol Vapes*, Filter (Dec. 14, 2022) (attaching memoranda), https://tinyurl.com/bddpthsw.

Meanwhile, FDA came under immense "scrutiny for what some have viewed as an inability to curb the teenage vaping crisis."[10] Amidst this turmoil, CTP received a new politically appointed Director who believes menthol-flavored e-cigarettes should be subject to the same heightened evidentiary standard as other flavored e-cigarettes. *See* Norcia, *supra.* The Office of Science dutifully changed course. *Id.*

As FDA staffers confirmed, "scientific decisions" are being "overruled by political agendas and [staffers are being] pushed to change decisions."[11] Indeed, a former FDA scientist reported that he and his colleagues "fear retaliation" for voicing concerns and that FDA "discourages dissenting voices."[12] An outside agency investigated and found it "deeply troubl[ing] that FDA's own scientific dispute process…failed…concerned scientists." *Id.*

### C. FDA grants tobacco-flavored Vuse Vibe, but denies menthol

RJRV spent ███████████ preparing Vuse Vibe applications (which covered tobacco, menthol, and other flavored versions). Through clinical studies, RJRV established that using Vuse Vibe "substantially reduces toxicant exposure in a manner *similar to smoking abstinence.*" A21 (emphasis added). Through surveys, RJRV showed that

---

[10] Christina Jewett, *F.D.A. Seeks Outside Review of Troubled Food and Tobacco Units*, N.Y. Times, July 20, 2022, https://tinyurl.com/ycxad5e4.

[11] Allison Boughner, *FDA Stakeholders Break Their Silence*, World Vapers' Alliance (Nov. 15, 2022), https://tinyurl.com/337t4569.

[12] Letter from U.S. Office of Special Counsel to the President 3 (Dec. 15, 2022), https://tinyurl.com/jenkezdp.

adult smokers transition away from cigarettes when they use e-cigarettes and that more current smokers are interested in menthol-flavored Vuse Vibe products than tobacco-flavored e-cigarettes. A23-25. RJRV also showed that youth use was likely to be very low. A24.

FDA granted RJRV's application for tobacco-flavored Vuse Vibe, concluding that "[t]he overall toxicological risk to the users of [Vuse Vibe] is lower compared to cigarettes."[13] It also noted, "current…adult smokers are particularly interested in the new products to assist in intended switching, and these products have the potential to benefit that group." *Id.* FDA found that these benefits "outweigh the risk to youth." *Id.* at 7.

But FDA denied the application for menthol Vuse Vibe. Why? FDA does not dispute RJRV's evidence, but instead cites the absence of long-term studies showing menthol Vuse Vibe produces greater benefits for adult smokers than tobacco-flavored e-cigarettes. FDA said those studies were necessary because of the "risks to youth." A83-84, A89-90. FDA discounted, among other things, RJRV's longitudinal cohort studies because they "were not brand- or product-specific." A84; A98. FDA also discounted RJRV's cross-sectional studies, which FDA conceded "show[] a positive association between being a former…smoker…and use of…[menthol Vuse Vibe],"

---

[13] FDA, *TPL Review of PMTAs* 6 (Apr. 2020) ("Ciro/Vibe Tobacco TPL"), https://tinyurl.com/5d387yfs.

because it was not clear that the former-smokers "used menthol-flavored [e-cigarettes] to quit." A84; A98. And it discounted RJRV's consumer-perception studies because those studies assess "precursors to behavior" but do not "directly assess actual product use behavior." A98. RJRV immediately requested that FDA stay its denial order; FDA refused. The next day, this Court granted an administrative stay.

## ARGUMENT

Issuing a stay is straightforward because this Court already granted one on materially identical facts in *Wages*. This Court considers whether an applicant is likely to succeed on the merits; whether the applicant will be irreparably injured absent a stay; whether a stay will substantially injure other parties; and the public interest. *Texas v. EPA*, 829 F.3d 405, 424-25 (5th Cir. 2016). The test is "a sliding scale," and "takes into account the intensity of each [factor]." *Med-Cert Home Care v. Azar*, 365 F. Supp. 3d 742, 749 (N.D. Tex. 2019). Where a case presents a "serious legal question" and the balance of equities heavily favors a stay, the petition need only present a substantial case on the merits. *Campaign for S. Equality v. Bryant*, 773 F.3d 55, 57 (5th Cir. 2014).[14] "The maintenance of the status quo is an important consideration in granting a stay." *Wages*, 16 F.4th at 1143.

_____

[14] A case presents a "serious legal question" when it concerns the public at large. *See Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 23-24 (5th Cir. 1992) (per curiam). This is such a case because it concerns consumer access to a product with substantial public health benefits. Accordingly, Petitioners need only show a substantial case on the merits (though a stay is warranted under either standard).

*Wages* held that the petitioner was very likely to succeed on APA claims and that the other factors likewise required a stay. So too here.

On likelihood of success, *Wages* held FDA inadequately considered four factors.

*First*, FDA failed to consider Wages' reliance on FDA's repeated statements that manufacturers were not required to conduct long-term studies. Despite FDA's previous assurances, "FDA pulled a surprise switcheroo," and said long-term studies were now required. 16 F.4th at 1138. *Second*, FDA failed to consider Wages' marketing plan. *Third*, "FDA did not consider alternatives when changing from its no-long-term-studies-necessary policy to its apparent long-term-studies-required policy." *Id.* at 1139. *Fourth*, FDA ignored evidence in Wages' applications, relying on "experience and expertise," but ignoring issues Wages raised. *Id.* at 1140.

The remaining factors likewise favored a stay. Wages faced irreparable injury because the costs of complying with FDA's order "are likely unrecoverable." *Id.* at 1142. On the balance of harms, a stay would maintain the status quo, "an important consideration." *Id.* at 1143. And because FDA's order was likely unlawful, there was no public interest in perpetuating it. *Id.*

*Wages* controls and Petitioners are entitled to a stay.

## I.   PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS

Because FDA committed the same errors here as in *Wages*, Petitioners are likely to succeed on the merits. In addition, Petitioners are entitled to a stay based on a claim not discussed in *Wages*.

### A.     Petitioners are likely to succeed for the reasons identified in *Wages*

As *Wages* recognized, arbitrary-and-capricious "review is not toothless"; "it has serious bite." 16 F.4th at 1136. Applying that rigorous standard, *Wages* unanimously concluded the petitioner "ha[d] shown a strong likelihood of success on the merits." *Id.* "That's because…FDA failed to reasonably consider the relevant issues and reasonably explain the Order." *Id.* FDA did the same here.

**1.** As in *Wages*, FDA ignored RJRV's "legitimate reliance interests," rendering the denial order unlawful. 16 F.4th at 1138. "When an agency changes course,…it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 1139.

Before the application deadline, FDA never said that for menthol (and other flavored) e-cigarettes, manufacturers would need to submit long-term, product-specific studies showing a particular e-cigarette was more likely than a tobacco-flavored e-cigarette to cause smokers to quit. Indeed, FDA repeatedly told manufacturers they *need not* "conduct long-term studies." *Id.*; *see also Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 282 (D.C. Cir. 2019). Additionally, FDA advised applicants before the application deadline that, when conducting studies, they were free to select comparator products. PMTA Guidance 13-14. "Many e-cigarette companies," including RJRV (*see* A15-16), "relied on…FDA's repeated" statements. *Wages*, 16 F.4th at 1138.

But that is not all. FDA directly told RJRV in a deficiency letter that its applications for Vuse Vibe's "flavored products (*other than menthol*)" needed evidence that those products "increase[d] the likelihood of complete switching among adult smokers relative to tobacco or menthol-flavored [e-cigarettes]." A39 (emphasis added). Setting aside that FDA never said that the evidence needed to be from long-term studies, FDA never identified a similar deficiency for menthol Vuse Vibe. A16; A39. And FDA granted the tobacco-flavored Vuse Vibe application even though it contained the same studies as menthol Vuse Vibe. A60-81. RJRV reasonably believed the same would be true for menthol—especially in light of the deficiency letter's "other than menthol" pump-fake. A16.

Then FDA "pulled a surprise switcheroo," denying RJRV's application because it lacked long-term studies showing that, as compared to tobacco-flavored e-cigarettes, menthol Vuse Vibe would produce benefits to adult smokers that outweighed the risk to youth. *Wages*, 16 F.4th at 1138; A83-84, A89-90. Because FDA failed to consider RJRV's "serious reliance interests," FDA's order is arbitrary. *Id.* at 1139.

**2.** FDA also arbitrarily ignored the marketing plan in RJRV's application. As *Wages* reiterated, FDA must reasonably consider the issues and reasonably explain its decision. 16 F.4th at 1136. *Wages* held that FDA failed to consider the applicant's marketing plan. *Id.* The Eleventh Circuit recently granted a petition for review for this reason. *See Bidi*, 47 F.4th at 1195. FDA made the same error here.

13

In a clear attempt to avoid *Wages* and *Bidi*, FDA's denial order stated: "The marketing restrictions and other mitigation measures that you proposed cannot mitigate these risks to youth sufficiently to reduce the magnitude of adult benefit required to demonstrate" that marketing the products should be allowed. *See, e.g.*, A83. And its Technical Project Lead Memorandum addressed marketing restrictions at a high level. *See* A92-96. But these self-serving discussions merely pay lip service to FDA's obligation to review marketing plans. FDA cannot ignore marketing plans and then paper over that failure by adding conclusory bureaucratese to its denial.

Instead, agencies must "reasonably *explain*[] the[ir] decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (emphasis added). FDA has not reasonably explained why the marketing plan is insufficient. Indeed, in 2020 (at the height of youth vaping), FDA found that the very restrictions RJRV proposed in its marketing plan *were sufficient* "to prevent minors' access" to menthol-flavored e-cigarettes.[15]

Nothing has changed to justify FDA's about-face. Indeed, menthol-flavored e-cigarettes are even *less* popular among youth now.[16] And overall youth e-cigarette use

---

[15] *See* FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems* 21-22 (rev. Apr. 2020) ("2020 Guidance"), https://tinyurl.com/8j58axb7; A28-38.

[16] *Compare* Maria Cooper, et al., *Notes from the Field: E-cigarette Use Among Middle and High School Students—United States, 2022* (Oct. 2022) (28.2% of high-school e-cigarette users preferred menthol in 2022), https://tinyurl.com/44fk6y8p, *with* Teresa W. Wang, et al., *E-cigarette Use Among Middle and High School Students—United States, 2020* (Sept. 2020) (37% of high-school e-cigarette users preferred menthol in 2020), https://tinyurl.com/5763s6a9.

has significantly declined since 2020—about 1.02 million *fewer* youth use e-cigarettes. *Compare* Cooper, *supra*, *with* Wang, *supra*. That is especially true for cartridge-based e-cigarettes (like Vuse), which are significantly less popular among youth than disposable e-cigarettes. *See* Cooper, *supra*. Agencies do not have "carte blanche…to issue a rule, and then defend it only by saying, 'because we said so.'" *Mayor of Baltimore v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020) (en banc). FDA cannot eschew marketing plans it once said were adequate by using "only generalized language." *See Siddiqui v. Holder*, 670 F.3d 736, 744 (7th Cir. 2012). Such conduct is no different from entirely ignoring the plans. And, as the Eleventh Circuit explained, FDA's failure was not harmless. *Bidi*, 47 F.4th at 1205.

**3.** FDA's order is also unlawful because "FDA insufficiently addressed alternatives to" denying RJRV's application. *Wages*, 16 F.4th at 1138. "[W]hen an agency rescinds [or alters] a prior policy[,] its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *DHS v. Regents*, 140 S. Ct. 1897, 1913 (2020). In considering those alternatives, the agency must "weigh any [reliance] interests against competing policy concerns." *Id.*

Here, however, "FDA did not consider alternatives when changing from its no-long-term-studies-necessary policy." *Wages*, 16 F.4th at 1139; A83-84. For example, FDA failed to consider inviting supplemental filings (rather than issuing denials). Until recently, this was FDA's routine practice. FDA regularly notified applicants of

deficiencies and permitted 13-plus amendments.[17] In fact, it did just that for non-menthol-, non-tobacco-flavored Vuse Vibe, notifying RJRV of the need for product-specific studies comparing these products to tobacco- and menthol-flavored e-cigarettes. A39.

**4.** FDA arbitrarily ignored other important aspects of the problem. The Court "must set aside any action premised on reasoning that fails to account for relevant factors." *Wages*, 16 F.4th at 1136. FDA's decision fails that test.

In assessing menthol Vuse Vibe, FDA failed to reasonably consider the evidence in RJRV's application showing that this product provides unique benefits to adult smokers seeking a potentially less risky tobacco product. FDA has repeatedly acknowledged that e-cigarettes provide potential health benefits to adult smokers. *See*, *supra*, pp. 4-5. And RJRV's applications proved "switching from smoking to…Vuse Vibe substantially reduces toxicant exposure in a manner similar to…*abstinence*." A21 (emphasis added). Indeed, over the next sixty years, Vuse Vibe could save 365,000 lives. A26-27. FDA explicitly recognized Vuse Vibe could potentially benefit adult smokers who switch when it authorized tobacco-flavored Vuse Vibe. *Supra* p. 9.

Moreover, FDA recognizes that "[m]enthol is unique compared to other available ENDS product flavors as it is the only characterizing flavor available in

---

[17] *E.g.*, FDA, *Technical Project Lead (TPL) Review of PMTA, PM0000491, PM0000492* 11-14 (Dec. 4, 2018), https://tinyurl.com/2p83ymvb.

cigarettes." 2020 Guidance 23. Menthol smokers looking for a potentially less risky product will prefer a menthol-flavored product, and are less likely to switch if one isn't available.[18] For this reason, FDA's Office of Science initially recommended *authorizing* menthol-flavored e-cigarettes. *See* Norcia, *supra.* It objectively concluded that "as long as menthol-flavored cigarettes remain on the market, menthol-flavored e-cigarettes could be a direct substitute for them, providing a less harmful alternative to menthol-flavored cigarette smokers." *Id.* And, if FDA carries through with its plan to ban menthol cigarettes, 87 Fed. Reg. 26,454 (proposed May 4, 2022), having menthol Vuse Vibe available would give menthol-cigarette smokers an option that poses potentially lower risk than switching to tobacco-flavored cigarettes.

In fact, a study of 4,187 adults showed more current cigarette smokers are projected to use *menthol* Vuse Vibe (6%) than *tobacco* Vuse Vibe (4.1%). A25. And cross-sectional data showed significantly more non-tobacco-flavored Vuse Vibe users were former smokers, as opposed to current smokers. A98.  Yet, FDA did not grapple with this. Instead, it discounted RJRV's study results because one study did not "directly assess actual product use behavior," A98, and the other did not show exactly that the surveyed smokers "used menthol-flavored [e-cigarettes] to quit." A84.

---

[18] *See* FDA, *Modifications to Compliance Policy for Certain Deemed Tobacco Products* 18-19 (Mar. 2019), https://tinyurl.com/mwprevt6.

Additionally, while FDA concluded the youth risk was too high, FDA arbitrarily excluded from its analysis any benefits e-cigarettes could provide youth who would otherwise use riskier tobacco products. (Although RJRV has strict controls to prevent marketing and sales to youth, FDA assumes some youth will illegally access e-cigarettes, just as they have historically obtained cigarettes.) Per government data, "the introduction of e-cigarettes has coincided with an acceleration in the decline in youth smoking rates."[19] This is no coincidence. Studies suggest that "[a]mong nonsmoking youth, vaping is largely concentrated among those *who would have likely smoked* prior to the introduction of e-cigarettes." *Id.* (emphasis added). Thus, some have observed that "youth vaping may have led to the extinction of young adult smoking."[20] FDA needed to weigh this evidence of the potential tobacco-harm-reduction benefits to youth who would otherwise smoke cigarettes.

In short, as in *Wages*, FDA ignored many critical issues. 16 F.4th at 1134-38.

---

[19] Natasha A. Sokol, *High School Seniors Who Used E-Cigarettes May Have Otherwise Been Cigarette Smokers: Evidence From Monitoring the Future (United States, 2009-2018)*, Nicotine & Tobacco Rsch. (2021), https://tinyurl.com/3w5hcaxr.

[20] Lindsey Stroud, *According to Data from the CDC, Youth Vaping Has Not Led to Smoking*, Townhall (Sept. 22, 2021), https://tinyurl.com/2s35vks8.

**B.    Petitioners are also likely to succeed because FDA unlawfully created a "tobacco product standard"**

Petitioners are likely to succeed on a claim not discussed in *Wages*: FDA violated the TCA by adopting a policy that no non-tobacco-flavored e-cigarette will be authorized.

Separate from APA requirements, the TCA explicitly requires FDA to follow notice-and-comment procedures before adopting a tobacco product standard. FDA must publish "a notice of proposed rulemaking for the establishment…of any tobacco product standard" and promulgate a final rule only after "the expiration of the period for comment." 21 U.S.C. § 387g(c)-(d). Statutorily mandated rulemaking procedures may not be evaded by making rules in the course of adjudicatory proceedings—no matter how politically expedient it may be to do so. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 624, 628 (5th Cir. 2001).

Here, it is undisputed that FDA did not engage in notice-and-comment rulemaking before establishing the policy of denying authorization for all but tobacco-flavored e-cigarettes. The only question is whether this policy amounts to a "tobacco product standard." It does. Congress—in the section of the TCA entitled "Tobacco product standards"—calls a ban on characterizing flavors in cigarettes other than tobacco or menthol a "tobacco product standard." 21 U.S.C. § 387g(a)(1)(A); *see also id.* § 387g(a)(2) (calling the prohibition a "tobacco product standard[]"); *id.* § 387g(a)(3) (same). FDA likewise has repeatedly characterized flavor prohibitions as "tobacco

product standards," including when it proposed (via rulemaking) a "product standard" that would ban menthol as a characterizing flavor in cigarettes,[21] and when it explained that "restricting or eliminating the use of flavors in" e-cigarettes would be a "tobacco product standard," 2020 Guidance 34.

Thus, a ban on flavors clearly creates a tobacco product standard. This is not the first time FDA has tried to ban flavors in e-cigarettes. In 2016, FDA submitted a draft rule to the White House, which would have prohibited any non-tobacco-flavored e-cigarette, including menthol.[22] But the White House removed that provision, thwarting FDA's plan.[23]

Failing to accomplish a flavor ban through rulemaking, FDA is now circumventing mandatory rulemaking procedures through the guise of individual denials. How? *After* the application deadline, FDA decided that applications for non-tobacco-flavored e-cigarettes must contain specific long-term studies.[24] FDA has called the failure to include such a study a "fatal flaw." *Id.* By not telling manufacturers about these requirements until *after* applications were due, FDA effectively ensured that all

---

[21] Tobacco Product Standard for Menthol in Cigarettes, 87 Fed. Reg. 26,454, 26,455-56 (proposed May 4, 2022).

[22] Regulations.gov, *Deeming Draft RIA as Submitted to OMB* 76-77, https://tinyurl.com/37bvsw88.

[23] Regulations.gov, *Deeming Rule Final Rule Redline Changes* 22-23, https://tinyurl.com/yv9djenb.

[24] *See Wages*, 41 F.4th at 444-45 (Jones, J., dissenting).

applications for non-tobacco-flavored products would be denied. Indeed, FDA has decided more than 99% of applications submitted by September 2020,[25] including more than 355,000 applications for non-tobacco-flavored e-cigarettes.[26] Every one of the over-355,000 non-tobacco-flavored-e-cigarette decisions has been a denial.[27] And when political winds shifted, FDA's recently appointed CTP Director memorialized a policy (against the Office of Science's recommendation) that would use the undisclosed, heightened evidentiary standard to ban menthol-flavored e-cigarettes too. *See* Norcia, *supra*.

RJRV submitted sophisticated, ▇▇▇▇▇▇▇▇ applications for Vuse Vibe—including long-term studies, as FDA acknowledges. The applications included product-specific evidence showing that cigarette smokers prefer menthol Vuse Vibe to tobacco-flavored e-cigarettes. Yet, *even that* was not enough to satisfy FDA. Instead, FDA offered other, pretextual reasons for discounting evidence that supports the very comparative-benefit showing FDA requires. A84, A98. FDA thus has adopted a tobacco product standard: no non-tobacco-flavored e-cigarettes.

---

[25] *See* FDA, Press Release, *FDA Issues Marketing Denial Orders to Fontem US for myblu Products* (Apr. 8, 2022), https://bit.ly/3OlQ29r.

[26] *See* Jim McDonald, *FDA Denies PMTAs for 300,000 More Flavored E-Liquids*, Vaping360 (Sept. 3, 2021), https://tinyurl.com/53w2szcw.

[27] *Cf.* FDA, *Premarket Tobacco Product Marketing Granted Orders* (Apr. 5, 2022), https://bit.ly/3MnpD9s; *see also* Corrected Opening Br. of Pet'r 21 n.6, *Breeze Smoke, LLC v. FDA*, No. 21-3902 (6th Cir. Nov. 16, 2021) (collecting denial orders).

FDA then used that standard to deny menthol Vuse Vibe, even though there is no physical difference (other than flavor) between tobacco-flavored Vuse Vibe (which FDA authorized) and menthol Vuse Vibe (which FDA did not).

In sum, FDA effectively banned all non-tobacco-flavored e-cigarettes, which constitutes a tobacco product standard. FDA failed to engage in the required notice-and-comment rulemaking, so this policy (and the resulting denial order) violate the TCA.

## II.    PETITIONERS FACE IRREPARABLE HARM

Like in *Wages*, Petitioners face imminent, irreparable harm due to FDA's decision. *See* 16 F.4th at 1142. "[C]omplying with [an agency order] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Id.* Courts, including this one, "have long recognized" that when, as here, "the threatened harm is more than de minimis, it is not so much the magnitude but the *irreparability* that counts for purposes of" temporary relief. *Dennis Melancon, Inc. v. New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012). Further, unlawful government enforcement action can irreparably injure a business's goodwill and reputation. *Emerald City Mgmt. v. Kahn*, 624 F. App'x 223, 224 (5th Cir. 2015) (per curiam).

Absent a stay, Petitioners will suffer these injuries. RJRV will lose almost ▇▇ ▇▇▇▇▇ in yearly revenue, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, which may include refunding retailers. *See* A05-06. ▇▇▇▇▇

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. A06. And RJRV risks damaging its relationship with business partners.

Moreover, customers once loyal to menthol Vuse Vibe may never pledge the same loyalty. *Id.* Customers who use tobacco-flavored Vuse Vibe may think the order means they should stop using it—which could cause lost sales and potentially cause retailers to pull authorized Vuse products from shelves. *Id.* And Vuse products may never return because retailers may give that shelf space to other manufacturers. *Id.*

The seller Petitioners' outlook is also bleak because they (or their members) stand to lose a significant amount of revenue. A09-12.

Final relief cannot negate these substantial injuries.

## III. THE REMAINING FACTORS FAVOR A STAY

As in *Wages*, "[t]he balance of…harms favors a stay." 16 F.4th at 1143. Where "the Government is the opposing party," the last two factors "merge": the government's interest is the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, those merged factors decisively favor relief.

Maintaining "the status quo is an important consideration in granting a stay." *Wages*, 16 F.4th at 1143. Staying FDA's order will preserve the status quo that has existed since menthol Vuse Vibe entered the market nearly seven years ago. After asserting jurisdiction, FDA has allowed menthol e-cigarettes to stay on the market without authorization for over six years. And FDA took years to decide RJRV's application. A small delay of this one denial order will not harm FDA. Moreover, the

"government cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). The balance of harms strongly supports a stay.

The public interest does too. "[T]here is generally no public interest in the perpetuation of unlawful agency action." *Wages*, 16 F.4th at 1143. "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Id.* Abruptly banning menthol Vuse Vibe while this case is pending would harm thousands of adult smokers who use menthol Vuse Vibe as a substitute for cigarettes. A05. Many of those former smokers may revert to cigarettes if they lose access to menthol Vuse Vibe. FDA previously warned this "outcome[]" was to be "avoided if at all possible."[28]

## REQUESTED RELIEF

This Court should stay FDA's denial order as to menthol Vuse Vibe.[29]

---

[28] Zeller Decl. ¶ 12, *Am. Acad. of Pediatrics v. FDA*, No. 8:18-cv-00883-PWG (D. Md. June 12, 2019), ECF No. 120-1.

[29] Respondents informed Petitioners that Respondents plan to move to extend the stay-motion briefing schedule; Petitioners have agreed not to oppose the motion provided the administrative stay remains in place pending a ruling on the stay motion. Although Petitioners previously noted they would file an "emergency" stay motion, Petitioners believe, in light of the parties' agreement and the administrative stay, that this stay motion no longer constitutes an "emergency motion" under Circuit Rule 27.3.

Dated: February 1, 2023

Respectfully submitted,

*/s/ Noel J. Francisco*

Noel J. Francisco
Christian G. Vergonis
Ryan J. Watson
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Tel: 202-879-3939
Fax: 202-626-1700
nfrancisco@jonesday.com
cvergonis@jonesday.com
rwatson@jonesday.com

*Counsel for Petitioners*

## CERTIFICATE OF CONFERENCE

In accordance with Fifth Circuit Rule 27.4, the undersigned hereby certifies that on January 31, 2023, counsel for Petitioners contacted counsel for Respondents. Respondents' counsel stated that Respondents oppose the motion.

Dated: February 1, 2023

*/s/ Noel. J. Francisco*

Noel J. Francisco

*Counsel for Petitioners*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE
REQUIREMENTS**

This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)

because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

- this document contains 5,179 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5)

and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

- this document has been prepared in a proportionally spaced typeface using Word 2016 in 14-point Garamond font.

Dated: February 1, 2023                 */s/ Noel. J. Francisco*

                                        Noel J. Francisco

                                        *Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2022, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: February 1, 2023                     */s/ Noel. J. Francisco*
                                             Noel J. Francisco

                                             *Counsel for Petitioners*

## CERTIFICATE OF ELECTRONIC SUBMISSION

I certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated: February 1, 2023                    */s/ Noel. J. Francisco*
                                            Noel J. Francisco

                                            *Counsel for Petitioners*

No. 23-60037

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

R.J. REYNOLDS VAPOR COMPANY, ET AL.,

*Petitioners*,

v.

U.S. FOOD AND DRUG ADMINISTRATION, ET AL.,

*Respondents.*

On Review from Order of the Food and Drug Administration Denying Premarket
Tobacco Product Application PM0000637 (Vuse Vibe) and PM0000713 (Vuse Ciro)

# APPENDIX TO MOTION TO SEAL &
# MOTION FOR A STAY PENDING REVIEW

Noel J. Francisco
Christian G. Vergonis
Ryan J. Watson
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Tel: 202-879-3939
nfrancisco@jonesday.com
cvergonis@jonesday.com
rwatson@jonesday.com

*Counsel for Petitioners*

# TABLE OF CONTENTS

| Tab | Document Title | Page |
|-----|----------------|------|
| 1 | Declaration of Christy L. Canary-Garner | A01 |
| 2 | Declaration of James Xu | A09 |
| 3 | Declaration of Philip A. Chamblee | A11 |
| 4 | Declaration of Christopher Junker | A13 |
| 5 | Ex. A to Decl. of Christopher Junker, Excerpts of Vuse Vibe Application | A20 |
| 6 | Ex. B to Decl. of Christopher Junker, Excerpt of Deficiency Letter (Dec. 18, 2020) | A39 |
| 7 | Ex. C to Decl. of Christopher Junker, Marketing Granted Order for Tobacco-Flavored Vuse Solo (Oct. 12, 2021) | A40 |
| 8 | Ex. D to Decl. of Christopher Junker, Marketing Granted Order for Tobacco-Flavored Vuse Vibe and Ciro (May 12, 2022) | A60 |
| 9 | Ex. E to Decl. of Christopher Junker, Marketing Denial Order for Menthol-Flavored Vuse Vibe and Ciro (Jan. 24, 2023) | A82 |
| 10 | Ex. F to Decl. of Christopher Junker, Excerpt of Technical Project Lead Memorandum related to January 24, 2023 Marketing Denial Order | A88 |

# TAB 1
Declaration of Christy L. Canary-Garner

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

R.J. REYNOLDS VAPOR COMPANY,
*et al.*,

                Petitioners,

    v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, *et al.*,

                Respondents.

CASE NO. 23-60037

_____

### DECLARATION OF CHRISTY L. CANARY-GARNER

I, CHRISTY L. CANARY-GARNER, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

### BACKGROUND

1.    I am the Vice President of Consumer Marketing for R.J. Reynolds Vapor Company ("RJRV"). RJRV is an indirect wholly owned subsidiary of Reynolds American, Inc. ("Reynolds"). I have been employed by RJRV from 2018 to the present. Prior to that, I was employed for fourteen years by R.J. Reynolds Tobacco Company, another subsidiary of Reynolds. And before that, I worked for over eleven years at Brown & Williamson Tobacco, which merged with R.J. Reynolds Tobacco Company in 2004. As Vice President of Consumer Marketing, I

1

am responsible for the commercial business management of the Vuse brand, including portfolio design, promotion strategy, volume and share, and financial P&L delivery. I also have access to the company's sales data.

2.　　This declaration describes the substantial losses that will be incurred by RJRV as a result of the United States Food and Drug Administration's ("FDA") denial of RJRV's premarket tobacco product applications for menthol Vuse Vibe products.

## VUSE PRODUCTS

3.　　RJRV does not make, market, or sell combustible cigarettes. Instead, RJRV's business is directed exclusively to the development and marketing of reduced risk tobacco products that present an alternative for adult smokers of combustible cigarettes. Specifically, RJRV manufactures electronic nicotine delivery systems ("ENDS") products under the brand name Vuse and distributes those products for sale in the United States. RJRV also sells Vuse products directly to age-verified adult consumers online.

4.　　RJRV has marketed and sold four lines of Vuse products in the United States—Solo, Ciro, Vibe, and Alto.

5.　　RJRV currently markets tobacco- and menthol-flavored Vuse Solo, Vuse Vibe, and Vuse Alto products. RJRV recently stopped manufacturing and

2

marketing all flavors of Vuse Ciro products; however, it may seek to sell these products again in the future.

6.      The Vuse products are the cornerstone of RJRV's future and a key embodiment of Reynolds's commitment to its guiding principles regarding tobacco harm reduction. (https://www.reynoldsamerican.com/about-us/guiding-principles.)

7.      The pictures below show Vuse products:

        

3




8.     RJRV submitted premarket tobacco product applications for each line of Vuse products. It submitted its applications for Vuse Solo on October 9, 2019. It submitted its applications for Vuse Vibe on March 31, 2020. It submitted its applications for Vuse Ciro on April 14, 2020. And it submitted its applications for Vuse Alto on September 3, 2020.

9.     On January 24, 2023, FDA denied RJRV's applications for menthol Vuse Vibe and Ciro products. Absent relief from this Court, RJRV will not be allowed to manufacture, market, sell, or distribute menthol Vuse Vibe and Ciro products for sale in the United States.

4

10. But for FDA's denials, RJRV would continue manufacturing, marketing, and distributing menthol Vuse Vibe products for sale throughout the country as well as selling menthol Vuse Vibe products online.

## THE EFFECTS OF FDA'S DENIALS

11. Based on my positions and involvement with RJRV, I have access to and responsibilities for financial and sales data and forecasts related to Vuse products. I base the following figures and estimations on my personal knowledge as a senior executive of this company.

12. Based on RJRV's consumer data, I estimate that there are currently ▬▬▬ users of menthol Vuse Vibe products. If FDA's decision is not stayed, those consumers will no longer be able to purchase this menthol Vuse product.

13. Based on prior comparable revenues, RJRV's total annual revenue from the sale of menthol Vuse Vibe is in excess of ▬▬▬.

14. If FDA's denial of the menthol Vuse Vibe application is not stayed pending the outcome of this litigation, RJRV will incur ongoing losses in revenue from the sale of that product. I estimate that RJRV will lose almost ▬▬▬ per month if FDA's orders remain in place.

15. RJRV will need to spend approximately ▬▬▬ to remove menthol Vuse Vibe from the market. In particular, RJRV may need to provide credits

to retailers and wholesalers who already purchased these menthol Vuse products but
now wish to return them to RJRV.

16.    RJRV will also have to spend approximately ███████ to destroy
e-liquids used in menthol Vuse Vibe.

17.    RJRV also stands to suffer reputational harm and loss of customer
goodwill. Based on my industry experience and personal knowledge relating to
ENDS products, I believe that, once menthol Vuse Vibe products are removed from
store shelves, some consumers will resort to using ENDS products from other
manufacturers and may never pledge the same brand loyalty they once had to Vuse
products.

18.    Customers loyal to other Vuse products, including menthol Vuse Solo,
and Alto, also may think FDA's order applies to their products, or think that FDA's
order means they should stop using them. This spillover effect could cause even
greater harm to RJRV's businesses, causing lost sales and potentially causing
retailers to pull Vuse products from the shelves.

19.    In addition, RJRV may lose relationships it has taken years to build
with retailers. If RJRV's products are removed from store shelves, they may never
return because retailers may devote that empty shelf space to products from other
manufacturers. I believe this loss of goodwill and reputation may be irreversible.

20.    Relatedly, removal of these products would harm the network of wholesalers that distribute them, as well as the retail locations where the products are sold.

21.    RJRV does not ship or sell directly to retailers. All Vuse products are sold through wholesale distributors, and title of the Vuse products transfers at the distribution level. RJRV does not own the Vuse products that are currently in the possession of wholesalers or that are available on retail shelves.

22.    If retailers are forced to take menthol Vuse Vibe off of the shelves, the retailers will lose associated sales revenue and will have to pay a restocking fee to the wholesaler when they return the products. The wholesalers would also face a corresponding loss of sales revenue if menthol Vuse Vibe is forced off the market.

23.    Moreover, RJRV stands to lose out on the money it invested in preparing the premarket tobacco product applications for its menthol Vuse Vibe products. For internal and external labor and capital costs, RJRV spent approximately ███████ on its Vuse Vibe applications. If FDA's decision is not stayed, a portion of RJRV's investment in completing those applications would be for naught.

## CONFIDENTIALITY OF CERTAIN INFORMATION

24.    RJRV considers much of the business information detailed above— including the information about customer data and analytics, estimated users, sales

7

and market data, projected financial harms, and the amount of investment RJRV made in its PMTAs—to be highly confidential, such that disclosure to the public, including its competitors, would harm its competitive standing in the marketplace.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 3l, 2023.

CHRISTY L. CANARY-GARNER

# TAB 2
## Declaration of James Xu

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

R.J. REYNOLDS VAPOR COMPANY,
*et al.*,

               Plaintiffs,

    v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, *et al.*,

               Defendants.

CASE NO. 23-60037

_____

### DECLARATION OF JAMES XU

I, JAMES XU, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am a Manager of a retail establishment known as Vuse Inspiration Store located at 79014 Highway 6 N., Ste. E., Houston, Texas 77095. Vuse Inspiration Store is owned and operated by Avail Vapor Texas, LLC ("Avail"), a limited liability company incorporated in Texas. Avail derives significant revenue from operation of Vuse Inspiration Store.

2.     I have been Manager of Avail since September 2020. In that capacity, I have responsibility for, among other things, the sale of e-cigarette products (also known as ENDS), including menthol Vuse products manufactured by R.J. Reynolds Vapor Company. Based on my position and involvement, I have access to and

responsibilities for financial and sales data and forecasts related to ENDS products sold by Avail.

3.    Avail sells menthol Vuse Vibe products at Vuse Inspiration Store.

4.    Avail derives a significant amount of its revenue from the sale of ENDS at this retail location, and derives a portion of that revenue from the sale of menthol Vuse Vibe products.

5.    Based on past revenues, I estimate that Avail's revenue from the sale of menthol Vuse Vibe products at Vuse Inspiration Store is more than $2,000 per year. This represents more than 4% of Vuse Inspiration Store's sales.

6.    If Avail is required to stop selling these products it will incur losses in revenue.

7.    In addition, if menthol Vuse Vibe products are forced off the market, Avail will have to dispose of its entire current inventory of those products, resulting in a complete loss of goods.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 30, 2023.

JAMES XU

2

# TAB 3
Declaration of Philip A. Chamblee

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

R.J. REYNOLDS VAPOR COMPANY,
*et al.*,

            Plaintiffs,

    v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, *et al.*,

            Defendants.

_____

CASE NO. 23-60037

### DECLARATION OF PHILIP A. CHAMBLEE

I, PHILIP A. CHAMBLEE, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am Executive Director of the Mississippi Petroleum Marketers and Convenience Stores Association (MPMCSA). MPMCSA is a nonprofit, statewide trade association incorporated in Mississippi with its headquarters and principal place of business located at 808 North President St., Jackson, MS 39202.

2.    MPMCSA has approximately 58 active marketer members who own and/or operate the majority of the approximately 2,400 convenience stores in the state of Mississippi.

3.    The majority of these members are tobacco retailers in Mississippi.

4. At their retail locations, these members sell e-cigarette products (also known as ENDS). In particular, some of these members sell menthol Vuse Vibe products manufactured by R.J. Reynolds Vapor Company.

5. As the Executive Director of MPMCSA, I have the responsibility for, among other things, representing MPMCSA's tobacco retailer members that sell ENDS products, including menthol Vuse Vibe products.

6. MPMCSA's members who are tobacco retailers derive a significant amount of their revenue from the sale of ENDS at their retail locations, and some of those members derive a portion of that revenue from the sale of menthol Vuse Vibe products.

7. Therefore, if those retail members are required to stop selling menthol Vuse Vibe products, they will incur losses in revenue.

8. Moreover, they will have to pay a restocking fee to the wholesaler when they return the products.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 30, 2023.

PHILIP A. CHAMBLEE

A12

2

# TAB 4
Declaration of Christopher Junker

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

——————————————————————

R.J. REYNOLDS VAPOR COMPANY,
*et al.*,

Petitioners,

v.

CASE NO. 23-60037

UNITED STATES FOOD AND DRUG
ADMINISTRATION, *et al*.,

Respondents.

——————————————————————

### DECLARATION OF CHRISTOPHER JUNKER

I, CHRISTOPHER JUNKER, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

### BACKGROUND

1.     I am Vice President, Scientific and Regulatory Affairs, at RAI Services Company ("RAIS"), a position that I have held since May 2021. RAIS coordinates regulatory compliance for the subsidiary companies of Reynolds American Inc., including R.J. Reynolds Vapor Company ("RJRV"). I have been employed by RAIS from June 2017 to the present. Prior to that, I was employed by R.J. Reynolds Tobacco Company ("RJRT"), another subsidiary of Reynolds American, Inc., for almost 6 years. I began as a scientist with the RJRT (2011-2013), and have served in other roles in RJRT and RAIS since then:

1

- Senior Scientist at RJRT (2013-2014)

- Lead Manager, Product Services at RJRT (2015-2016)

- Senior Manager, Product Services at RJRT (2016-2017)

- Director, Scientific & Regulatory Affairs at RAIS (2017-2019)

- Senior Director, Scientific & Regulatory Affairs at RAIS (2019-2021)

2.    During my time at RAIS' Science and Regulatory Affairs Division, I have worked on and become knowledgeable of RJRV's premarket tobacco product applications ("PMTAs") for Vuse products.

3.    This declaration describes the procedural history of RJRV's PMTAs for its menthol Vuse Vibe and menthol Vuse Ciro products and the United States Food and Drug Administration's ("FDA") denials of those applications.

4.    RJRV manufactures electronic nicotine delivery systems products under the brand name Vuse and distributes those products for sale in the United States. RJRV also sells Vuse products directly to age-verified adult consumers online.

5.    RJRV markets and sells four lines of Vuse products in the United States—Solo, Vibe, Ciro, and Alto.

6.    RJRV currently markets tobacco- and menthol-flavored Vuse products.

7.    RJRV submitted premarket tobacco product applications for each line of Vuse products.

2

## VUSE APPLICATIONS

8.      RJRV submitted PMTAs for Vuse Solo on October 9, 2019, PMTAs for Vuse Vibe on March 31, 2020, PMTAs for Vuse Ciro on April 14, 2020, and PMTAs for Vuse Alto on September 3, 2020. Each of the applications (which covered tobacco, menthol, and several other flavored versions) spanned over 150,000 pages. Excerpts of the Vibe applications are attached as Exhibit A.

9.      Based on RJRV's review of FDA guidance and FDA's public statements, RJRV understood that its applications would not need to include long-term studies—i.e. longitudinal studies of six months or more—given that FDA stated that such studies were not expected or required. RJRV also understood that its applications were not required to include a comparison of the effectiveness of RJRV's menthol-flavored products in assisting adult smokers to quit smoking to the effectiveness of tobacco-flavored e-cigarettes in doing the same. Specifically, FDA stated that "in general, FDA does not expect that applicants will need to conduct long term studies to support an application." FDA, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems (ENDS)* 13 (June 2019), https://tinyurl.com/3rmz9ab4. FDA explained that "long term" studies were those "that are conducted over six months or longer." *Id.* FDA also suggested that manufacturers had discretion to choose similar products to compare their products

3

to, as long as the products were ones consumers considered "interchangeable" and "likely to be used in the same manner." *Id.*

10.    FDA issued one deficiency letter regarding RJRV's Vuse Vibe and Ciro applications. It issued that letter on December 18, 2020. FDA did not issue any other deficiency letter for the Vuse Vibe and Ciro applications.[1]

11.    That deficiency letter is attached as Exhibit B.

12.    In the letter, FDA asked RJRV to "provide evidence to demonstrate that the use of [the Vuse Vibe and Ciro] flavored products (other than menthol) increases the likelihood of complete switching among adult smokers relative to tobacco or menthol-flavored products." The letter never stated that the same evidence was required for the menthol- or tobacco-flavored Vuse Vibe and Ciro applications. And FDA granted the tobacco-flavored Vuse Vibe and Ciro applications even though those applications did not contain this evidence. Based on FDA's exclusion of the menthol-flavored Vuse Vibe and Ciro applications from that portion of the deficiency letter, RJRV understood that its applications for menthol-flavored Vuse Vibe and Ciro did not need to contain product-specific studies showing that those products outperform others in terms of getting adult smokers to switch.

---

[1] FDA did issue one correction to its deficiency letter on February 17, 2021. That correction did not deal with the deficiency discussed in this declaration.

4

## FDA GRANTS AUTHORIZATION FOR TOBACCO-FLAVORED PRODUCTS

13.    On October 12, 2021, FDA issued a Marketing Granted Order for tobacco-flavored Vuse Solo.

14.    FDA's Marketing Granted Order for tobacco-flavored Vuse Solo is attached as Exhibit C.

15.    On May 12, 2022, FDA issued Marketing Granted Orders for tobacco-flavored Vuse Vibe and tobacco-flavored Vuse Ciro.

16.    FDA's Marketing Granted Order for tobacco-flavored Vuse Vibe and Ciro is attached as Exhibit D.

## FDA DENIES AUTHORIZATION FOR MENTHOL-FLAVORED VIBE & CIRO

17.    On January 24, 2023, FDA denied RJRV's applications for menthol Vuse Vibe and menthol Vuse Ciro.

18.    FDA's Marketing Denial Order for menthol Vuse Vibe and menthol Vuse Ciro is attached as Exhibit E.

19.    Excerpts of FDA's Technical Project Lead Memorandum related to the January 24, 2023 Marketing Denial Order are attached as Exhibit F.

5

## VUSE ALTO AND MENTHOL VUSE SOLO

20.    As noted above, RJRV submitted its application for Vuse Alto on September 3, 2020. It also submitted an application for menthol-flavored Vuse Solo on October 9, 2019. Both applications remain pending with FDA.

## CONFIDENTIALITY OF CERTAIN INFORMATION

21.    RJRV considers the organization and contents of its PMTAs, as well its communications with and responses from FDA regarding its PMTAs, to be highly confidential, nonpublic business information.

22.    RJRV and FDA have long agreed to treat the sensitive information contained in the applications as confidential. RJRV submitted its Vuse PMTAs in reliance on FDA's representations that they would remain confidential. And RJRV has not publicly revealed the information in its applications.

23.    RJRV's PMTAs contain information about the engineering, design, components, construction, chemical makeup, ingredients, and specifications of RJRV's products, and details about how RJRV compiled its PMTAs. Disclosure of this confidential, proprietary business information (even as to the PMTAs' tables of contents) would allow competitors to discover what RJRV included in its PMTAs and replicate those without incurring the substantial costs that RJRV incurred— meaning that RJRV would lose the competitive advantage it has gained through the development of its unique PMTA process. Further, this disclosure would give

competitors insight into RJRV's business decisions and the design of its products, similarly harming its competitive advantage.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 3**1**, 2023.

CHRISTOPHER JUNKER

7

# TAB 5
Ex. A to Decl. of Christopher Junker, Excerpts of Vuse Vibe Application

# Vuse Vibe PMTA § G

### G.4.1    Smokers Who Switch to Vuse Vibe Decrease Exposure to Tobacco Smoke Constituents, Thereby Likely Decreasing Health Risk

RAIS sponsored a clinical study to examine changes in biomarkers of toxicant exposure in non-menthol smokers switched to Vuse Vibe (Original) or abstinence (CSD170501). Resulting mean biomarker reductions for those constituents recommended by FDA for analysis in ENDS e-liquids and aerosols that have validated biomarkers are presented below (Figure G-10). Other than nicotine in the Vuse Vibe group, similar and substantial reductions were seen for all biomarkers assessed, regardless of whether smokers were switched to Vuse Vibe or abstinence. These results demonstrate that switching from smoking to use of Vuse Vibe substantially reduces toxicant exposure in a manner similar to smoking abstinence.

**Figure G-10:    Reductions in Constituent Exposure in Smokers Switched to Vuse Vibe or Abstinence are Comparable**



Constituent exposure changes are determined from constituent-specific biomarkers, listed here in parentheses following the constituent name. 4-ABP: (4-aminobiphenyl); Acrolein: (3-hydroxypropyl mercapturic acid [HPMA]); Acrylonitrile: (2-cyanoethyl mercapturic acid [CEMA]); 1-AN: (1-aminonaphthalene); 2-AN: (2-aminonaphthalene); B[a]P: (Benzo[a]pyrene; 3-hydroxy-benzo[a]pyrene) (3-OH-B[a]P); Benzene: (S-phenyl mercapturic acid [SPMA]); 1,3-Butadiene: (Monohydroxybutenyl mercapturic acid [MHBMA]); Crotonaldehyde: (3-hydroxy-1-methylpropylmercapturic acid [HMPMA]); NNK: (Nicotine-derived nitrosamine ketone; 4-(methylnitrosamino)-1-(3-pyridyl)-1-butanol + glucuronides [Total NNAL]); NNN: (N-nitrosonornicotine; N-nitrosonornicotine + glucuronides [Total NNN]); o-toluidine: (o-toluidine (o-T)); Nicotine: (NICEQ-T [Total Nicotine Equivalents]).
Source: CSD170501 Table 11-1 and Table 11-5 (Vuse Vibe, Abstinence).

**A21**

# Vuse Vibe PMTA § H

A24

# Vuse Vibe PMTA § C

**RAI Services Company**

Michael W. Ogden, Ph.D.
Senior Vice President
Scientific & Regulatory Affairs
Winston-Salem, NC 27101

## CONFIDENTIAL, NOT FOR PUBLIC DISCLOSURE

November 9, 2018

## VIA EMAIL AND HAND DELIVERY

Scott Gottlieb, M.D.
Commissioner
U.S. Food and Drug Administration
Center for Tobacco Products
Document Control Center
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

### Re:    September 12, 2018 Letter Request

Dear Commissioner Gottlieb:

On behalf of RAI Services Company,[1] I write in response to your September 12, 2018, letter regarding the ongoing reevaluation by the Food and Drug Administration ("FDA" or "Agency") of its current compliance policy regarding e-cigarettes and similar vapor products. As an initial matter, we would like to thank you and your staff at the Agency for meeting with us on October 11, 2018.

You have challenged us, and other leading industry members, to identify ways to reduce youth use of vapor products. We share your concerns over the recently reported increase in youth use of vapor products, and we are committed to working with the FDA to address the issue. Youth tobacco prevention is a priority for the RAI Group, and as a market leader, we take seriously our responsibility to combat youth use. This letter both describes our current practices and responds to the Agency's request that we identify additional actions to address and mitigate youth use of e-cigarettes and other vapor products.

---

[1] RAI Services Company coordinates regulatory compliance for Reynolds American Inc.'s ("RAI") subsidiary companies, including R.J. Reynolds Tobacco Company, RAI Trade Marketing Services Company, R.J. Reynolds Vapor Company, and RJR Vapor Co., LLC (collectively, "the RAI Group" or "the Company"). For ease of reference, use herein of "the RAI Group" or "the Company" may refer to activities undertaken by one or more of these subsidiary companies.

The RAI Group intends to take a comprehensive set of steps to address youth use of vapor products, including the following:

- We will support establishing 21 as the minimum age of purchase for tobacco products in the United States (as we discussed at the October 11 meeting).

- We commit not to market RAI Group products through social media "influencers."

- We will require age-verification for access to the VUSE website and institute more stringent online purchase limits of $80 per week and three devices per quarter to prevent "straw" purchases.

- We will take action at retail by establishing and enforcing contractual penalties for contracted retailers that sell tobacco products to youth.

- We will have our trade representatives meet with our ███████████ contracted retailers to emphasize the importance of compliance with underage sales laws, institute a mystery shopping program to check compliance, and establish an enforcement monitoring program.

- We support an abbreviated and expedited initial pre-market tobacco product application process that could have the effect of early removal of vapor products that are marketed irresponsibly.

These and other actions are discussed in greater detail below.

Sections I through IV of this letter explain the RAI Group's current practices and planned controls across four major areas. Section I, Product Access, addresses our current practices and future plans regarding sales of vapor products in traditional retail outlets and online. Section II, Product Marketing, discusses restrictions on the content and placement of marketing communications for VUSE vapor products. Section III, Product Appeal, addresses product flavors, pre-market submissions, and research. Section IV, Vapor Product Education, describes our current and future youth tobacco prevention efforts. Section V lays out the timeframes for implementation of the planned enhancements to our existing controls. Section VI contains additional options for Agency consideration.

The RAI Group appreciates the careful balance that FDA has pursued thus far between ensuring that adult tobacco consumers have access to tobacco products and making sure that youth do not. We also understand that this balance is being challenged by the recent increase in youth use of e-cigarettes and other vapor products. While we believe that the RAI Group has acted responsibly in its past efforts to address potential youth use of VUSE products, we take seriously the new data referenced in your September 12 letter and the October 11 meeting regarding the increasing use by youth of vapor products, as well as evidence of retailers' illegal sales of vapor

CONFIDENTIAL, NOT FOR PUBLIC DISCLOSURE

products, including VUSE, to youth. As we stated in our meeting, we are committed to working with FDA and other stakeholders on this important public health issue.

The use of vapor products by youth increased during the first few years after such products became more widely available, but we were comforted to see that during the period from 2015 to 2017, when VUSE was the leading e-cigarette brand sold in the United States, reported underage use of e-cigarettes declined.[2,3] Since the launch of VUSE, its marketing has been designed to appeal to *current adult smokers and vapers aged 21 and over*, which is reflected in our business activities and the position of VUSE in the market.

[4]

The RAI Group wants to be an asset and resource to the Agency in developing solutions applicable to the entire industry to reduce youth tobacco product appeal, access, and use. We look forward to your feedback and offer our continued cooperation to address this important problem confronting public health, FDA, and the industry.

## I.    Product Access

We understand and agree with the Agency that limiting product access by youth is an important means by which the RAI Group and others in the industry can impact youth use of vapor products. Survey data demonstrate that youth obtain vapor products from social sources (*e.g.*, friends, family) as well as from traditional retail outlets and online storefronts. According to the 2017 National Youth Tobacco Survey ("NYTS") (the most recent data to which the Company has access), the approximately two-thirds of youth who indicated using a vapor product in the past 30 days obtained such products from social sources, including friends (49%), family members (13.7%), or some other person (7.0%). By contrast, retail sources generally were less common: retail/gas (6.6%), grocery/drug stores (2.6%), mall/shopping center stands/kiosks (1.8%), or the internet (4.7%).[5] Vape shops, which do not typically sell the VUSE brand, represent a relatively high percentage of retail sales to youth, reported in the NYTS at 11.8%.[6] Accordingly, we would encourage FDA to advocate for penalties at the state and federal levels for individuals and vape shops providing tobacco and vapor products to youth in addition to traditional retail enforcement.

---

[2] Wang TW, Gentzke A, Sharapova S, Cullen KA, Ambrose BK, Jamal A. *Tobacco Product Use Among Middle and High School Students — United States*, 2011–2017. MMWR Morb Mortal Wkly Rep 2018; 67:629–633.

[5] *See* https://www.cdc.gov/tobacco/data_statistics/surveys/nyts/index.htm.

[6] We understand from recent public statements that the Agency may be considering restricting the sale of flavored vapor products to vape shops. *See, e.g.,* Angelica LaVito, *FDA to consider limiting e-cigarette sales to vape shops to curb youth use,* CNBC.com (Oct. 19, 2018), *available at* https://www.cnbc.com/2018/10/19/as-youth-e-cigarette-use-surges-fda-may-stop-convenience-store-sales.html. We respectfully ask that FDA consider carefully whether such a restriction would have the intended effect of reducing youth access to vapor products, given the NYTS data demonstrating that vape shops represent the most common source of retail-based access for youth.

We address youth access to vapor products via social sources, retail outlets, and online storefronts below. The RAI Group follows strict marketing guidelines and controls for all of our tobacco products, including VUSE, in an effort to ensure that only adult tobacco consumers have access to VUSE products. However, recognizing the reported increase in youth use and FDA's enforcement activity related to retail sales of vapor products to youth, we intend to increase our existing efforts at retail and online as described below.

### A.    Age of Purchase

The RAI Group agrees that youth should never use tobacco products, including vapor products. On our branded VUSE website, sales are restricted to age-verified adult tobacco consumers 21 and older, whereas the legal age for the sale of vapor products in most jurisdictions is 18 and older. Because many youth obtain vapor products from friends between the ages of 18 and 21, we understand that FDA may consider raising the age of purchase to 21, as a way to prevent teens from acquiring vapor products through such sources and as an effective means to keep vapor products out of middle and high schools. At the October 11 meeting, FDA informed us of recent NYTS data indicating an increase in youth use of vapor products in the United States. Based on this data, we would support state and federal legislation that increases the minimum age of purchase to 21 in the United States.

### B.    Traditional Retail Sales

As we discussed, the vast majority of sales of the RAI Group's tobacco products, including VUSE, involve in-person transactions at traditional, brick-and-mortar retail stores around the country. The RAI Group currently maintains vapor marketing plan contracts with ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ (including convenience stores, fuel retailers, and other retail outlets), related to the sale, merchandising, and promotion of vapor products. The RAI Group requires every retailer that signs a contract related to the sale and merchandising of VUSE products to agree to the following: (a) "Retailer will not sell tobacco products to underage persons;" (b) "Retailer will maintain 'We Card' materials at retail intended to aid in the elimination of sales to minors;" and (c) "Retailer will not sell, distribute, merchandise, advertise, or promote VUSE products in a fashion that violates federal, state, or local law." Further, the contract provides that the RAI Group may suspend payments under the contract or terminate the agreement in the event of a conviction for underage sales.

Following FDA's recent major enforcement effort against more than 1,300 retailers that illegally sold vapor products to minors, we have reviewed our retail contracts and plan to institute specific penalties to our contracted retailers for selling any tobacco products to underage persons, specifically the use of a tiered approach that will begin with a formal warning and will escalate in the event of multiple infractions to reducing and eventually removing promotional payments to a contracted store. As a first step, we will be contacting the contracted retail outlets that illegally sold VUSE products to youth during FDA's enforcement effort, which will constitute their first formal warning from the RAI Group.

CONFIDENTIAL, NOT FOR PUBLIC DISCLOSURE

To assist in these efforts, the RAI Group is expanding its internal regulatory monitoring program to monitor retail enforcement. RAI Trade Marketing Services will collaborate with RAI Services Company's Scientific & Regulatory Affairs function to monitor current FDA enforcement activity; review and analyze past enforcement efforts and data; monitor retail enforcement at the state and local levels; and evaluate survey data and sales trends. We also encourage the Agency to institute a process of contemporaneous notification to manufacturers of non-compliant retailers when any vapor product is sold illegally to a minor at a given retail outlet. Having timely access to information on the retailer and the product(s) involved will support the RAI Group's efforts to take action with contracted retailers, as well as the ability of the rest of the industry to respond appropriately.

The RAI Group intends to have its trade marketing representatives discuss the issue of underage youth access with each of the ███████ contracted retailers[7] within the next six months and on a regular basis going forward. We will reiterate the importance of compliance with underage sales laws and explain clearly that their employees need to apply the same diligence in confirming legal age of purchase as they do for cigarette sales. We will heighten their awareness of the consequences of vapor sales to minors and explain the changes we are making with respect to the penalties for contract non-compliance. We will ensure that the retailer has access to the latest *We Card*[8] program materials. We also will provide access to additional materials and resources on preventing youth access to tobacco products via the RAI Group's online customer portal, EngageTradePartners.com. Additionally, the RAI Group will take advantage of *We Card*'s "mystery shopping" program to monitor whether store employees are verifying the legal age of purchase for tobacco products and will take action accordingly.[9] We feel confident that our retail partners will take these matters seriously and utilize this training to bolster their efforts to prevent youth access to tobacco and vapor products. The RAI Group will encourage its retail partners to report any enforcement actions to us, and we would be pleased to share that information with the Agency as it becomes available.

To support monitoring efforts, we propose that FDA convene an industry meeting to discuss the development of a voluntary, industry-wide compliance program. Together, the industry could mount a far broader education effort across the country, providing retailers with additional training and materials related to vapor products and youth access. Having industry-wide support would provide consistency, enable a greater scale of effort, and facilitate FDA's communications with industry representatives. In addition, the industry could work with *We Card* to develop an enhanced program that incorporates monitoring and additional retail employee training.

███████████████████████████████████████████████

[8] Discussed in Section IV.B, below.

[9] The current *We Card* mystery shopping program is a training service provided to individual outlets on a bimonthly basis. We will work with *We Card* to develop a holistic program to provide a version of this service for our contracted retail outlets. We would be pleased to share the program data with FDA periodically or as requested by the Agency.

CONFIDENTIAL, NOT FOR PUBLIC DISCLOSURE

A33

Notwithstanding our commitment to take action to prevent vapor product sales to minors, it is important to note that despite the existence of a retailer contract, it is not fully within our power to prevent entirely sales of vapor products to or at an individual retail outlet. A retailer can obtain vapor products without the existence of a marketing contract. In fact, a retailer can obtain vapor products for resale from any wholesaler or membership club (such as Costco or Sam's Club), or even from another retailer. Accordingly, we think it is critical to inform the Agency that even if the RAI Group terminates its marketing agreement with a contracted retail outlet due to repeated violations, such termination will not foreclose that retailer's ability to sell VUSE or other vapor products.

We recognize that Congress established the civil money penalties for violations of the Family Smoking Prevention and Tobacco Control Act that relate to tobacco products, including vapor products. In the absence of further Congressional action, it would be very impactful for FDA to make a public statement asking states to increase their penalties for illegal sales to minors, up to and including loss of tobacco sales licenses (where applicable). Strong encouragement from the Agency could provide the needed impetus for those states that do not already do so to require licensing for vape shops and similar non-traditional retail establishments engaged in the sale of vapor products, which have similar concerns to address regarding youth access to such products. More comprehensive and consistent enforcement at the state level, coupled with industry-driven efforts, would serve to further reduce the likelihood of youth access to vapor and other tobacco products.

## C.    Online Sales

Online sales, or "e-commerce," is estimated to account for less than 30% of the total vapor market.[10] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Nevertheless, we have re-evaluated our online sales practices and have given serious thought to additional measures that could be imposed to prevent online sales to youth.

The RAI Group began online sales of VUSE vapor products at vusevapor.com in January 2018. The VUSE website currently restricts the viewing of content to adult tobacco consumers who certify that they are 21 years of age or older, but no product purchases are possible without age verification by our third-party vendor, Veratad, a pioneer in the development of online age verification. The process requires the submission of the last four digits of a social security number ("SSN") or knowledge-based authentication ("KBA") before a consumer can make a purchase or register on the site.[11] This approach is widely accepted as an industry best practice for online age

---

[10] Wells Fargo Securities estimate (2018), *available at* https://www.wellsfargoresearch.com/Reports/ViewReport/6dd7ce28-1708-4b56-9c05-cd59ca71fb40?source=WFR.COM&ght=bc605b8a-3f2e-4903-.

[11] Under the last-four SSN verification process, a third party verifies an individual's SSN by matching information specific to that person—including their name, street address, and phone number—to their SSN file. Under dynamic KBA, an individual must answer a series of multiple-choice questions referencing current and historical data derived primarily from government sources. To initiate the process, basic identification factors such as name, address, and date of birth must be provided. With this information, the third-party KBA provider pulls public and commercially

CONFIDENTIAL, NOT FOR PUBLIC DISCLOSURE

verification. Both methods are commonly used by government agencies and private industries to, among other things, maintain confidentiality of sensitive information and prevent fraud. The last four digits of a person's SSN are commonly used by verification services to confirm a person's identity. Further, the Federal Trade Commission has recognized the efficacy of KBA using appropriate challenge questions, and several state governments and federal agencies use dynamic KBA as a method of confirming identities and preventing fraud. In addition to age verification, the RAI Group also imposes purchase limits ($200 per transaction) and monitors unusual account activity to combat potential "straw" purchases.

While we believe our current online safeguards and protections are reasonable and appropriate, we are sensitive to FDA's concerns regarding straw purchases and youth access. For that reason, we will be instituting the following additional controls:

- requiring third-party age verification before visitors can access the website's content;[12]
- implementing a more stringent purchase limit of $80 per week and three devices per quarter per customer[13] to render straw purchases unlikely; and
- instituting purchase pattern monitoring and banning purchasers that attempt to purchase products for resale in violation of the site's Terms of Sale.[14]

The RAI Group would like to work collaboratively with the Agency as it considers policy and enforcement options. We would welcome FDA to require other manufacturers and online sellers to institute these safeguards. As a result of the enforcement actions announced last month, the Company has evaluated the availability online of VUSE products via unauthorized sales through eBay and other third-party internet storefronts. We noticed several instances of VUSE products offered for sale. We will be sending letters to eBay and other similar platforms demanding that

---

available data records to generate a unique set of questions that correspond to the individual's identity. These questions are presented to the end user, and a pass/fail result is provided. KBA questions often are referred to as "out-of-wallet" questions because the knowledge needed to answer the questions (for instance, "What street did you live on at your previous residence?") is not held in a wallet and therefore is very difficult for anyone other than the genuine user to know or guess. The series usually includes one diversionary question that is designed to trick a fraudster, such as asking for information about a car loan that does not actually exist, to which the correct response would be "none of the above."

[12] The Product FAQs on the VUSE website (https://vusevapor.com/faqs/product/) do not require age verification and will continue to be accessible without third-party verification as an extension of product labeling information. These FAQs—which provide purchasers of VUSE products with information about warnings, instructions, product ingredients, and use—are not promotional in nature.

[13] Dollar and device limits refer to direct-to-consumer sales from vusevapor.com to adult tobacco consumers. The VUSE e-commerce platform also will be used to enable verified business-to-business sales, which necessarily will entail larger orders.

[14] The Terms of Sale on the VUSE website (https://vusevapor.com/terms-of-sale) provide that: (1) products are available to only end-user adult (age 21+) vapor consumers; (2) customers may not purchase products from the site for resale; and (3) the Company reserves the right to refuse or cancel an order if it suspects that a customer is purchasing products for resale.

CONFIDENTIAL, NOT FOR PUBLIC DISCLOSURE

they require third-party age verification of purchasers or cease selling VUSE products on their sites, and we will continue to monitor these sources as part of our internal enforcement monitoring program.

Additional industry-wide restrictions could include requiring telephone order confirmation prior to order shipment or requiring an adult signature at delivery. If, after considering these potential safeguards, FDA sees fit to ban direct-to-consumer online sales across the industry and vigorously enforce such a ban, the RAI Group would not challenge the Agency's decision.

## II.   Product Marketing

The RAI Group designs and directs its product marketing to reach adult tobacco consumers. We implement this standard in a variety of ways. First, direct interactions with consumers (*e.g.*, email, direct mail, consumer engagement) are restricted to existing adult tobacco consumers of tobacco products aged 21 and older who have told us that they want access to tobacco advertising and want to receive communications from us. Specifically, they must certify that they are adult tobacco consumers aged 21 or older and must be age-verified by our third-party age-verification provider.[15] Second, with respect to mass media (print advertising, television), the RAI Group employs strict guidelines to ensure that the audience is overwhelmingly adult. In addition to restricting the dissemination of marketing communications, the RAI Group imposes voluntary restrictions on the content of those marketing messages. These restrictions on the content and dissemination of our marketing communications are described in greater detail below.

### A.   Voluntary Restrictions on Content of Marketing Communications

The RAI Group has voluntarily implemented specific guidelines that restrict the content of marketing and advertising materials for its vapor products:

- No testimonials by sports figures or celebrities or any person with special appeal to persons under 21 years of age;
- No person appearing in any advertising materials shall be under age 25 or be styled to look under age 25;
- Content shall not include characters, images, or themes designed to target youth;
- Content shall not be related to youth or youth-oriented activities;
- Content shall not suggest that use of R.J. Reynolds Vapor Company's ("RJRV") products is essential to social prominence, distinction, success or sexual attraction, nor shall any content picture a person using any RJRV products in an exaggerated manner; and
- Content shall not depict persons participating in, or obviously just having participated in, a physical activity requiring stamina or athletic conditioning beyond that of normal recreation.

---

[15] *See* Section I.C., above.

CONFIDENTIAL, NOT FOR PUBLIC DISCLOSURE

The RAI Group applies these guidelines for its vapor product marketing materials across all media, as detailed below. We would encourage FDA to apply similar guidelines across the industry.

### B.     Dissemination of Marketing by Medium

To the extent that the RAI Group utilizes mass media (print, television) or online advertising, it is committed to placing VUSE brand advertising only in media that are accessed by overwhelmingly adult audiences. The process the RAI Group employs to reach such adult audiences varies by type of media, as described below.

*Print Media*. A print publication must be evaluated and approved by the RAI Group[16] prior to advertising placement. The publication approval process applies to all advertising insertions in print media including magazines, newspaper supplements, national newspapers and local/alternative weekly publications. Neither the RAI Group nor third-party agencies working on its behalf may approve the purchase of any print advertising space without meeting specific internal criteria. As part of this process, readership-measurement data regarding the age of a publication's readership is analyzed. The RAI Group only advertises in print publications where 85% or more of the publication's readership is 18 years of age or older[17] (where Mediamark Research Inc. ("MRI") print publication 12+ survey data is available) or where the median readership age is at least 23 (where MRI 18+ survey data is available).[18] For publications on which no readership measurement has yet been conducted by a third-party resource, an in-depth evaluation of the publication's own proprietary readership data, editorial and advertising content and business plan (relative to readership) must be conducted to ensure that the publication is designed for and primarily intended for adults.

*Online Advertising*. The RAI Group's online advertising is subject to similar specific placement restrictions. Digital banner ads appear only in online media where at least 85% of the users of a site are at least 18 years of age or older,[19]

---

[16] The Company's agency of record for media purchases evaluates publications and submits sample copies and recommendations to Company personnel with accountability for advertising. If the publication meets the Company's criteria, the publication is approved.

[17] These age-based metrics, which originally were implemented by R.J. Reynolds Tobacco Company for cigarette product print advertising as part of a 2004 Settlement Agreement made with the State of California, are consistent with the language of 21 C.F.R. 1140.32(a)(2)(i), *Format and content requirements for labeling and advertising* ("For the purposes of this section, an adult publication is a newspaper, magazine, periodical, or other publication: (i) Whose readers younger than 18 years of age constitute 15 percent or less of the total readership as measured by competent and reliable survey evidence").

[18] When measuring readership, MRI surveys define the "adult" segment as readers 18 years of age and older and "youth" as readers 12-17 years old. We are not aware of any commercially available and widely accepted third-party media measurement source that has a survey based on the 21+ age band. The RAI Group employs this standard for advertising across all product platforms.

[19] As with MRI print publication measurement, the leading online analytics companies (*e.g.*, Nielsen, comScore) define as "adult" those viewers that are 18 years of age and older.

CONFIDENTIAL, NOT FOR PUBLIC DISCLOSURE

as measured by Nielsen, comScore, Google Analytics, or similar services. In addition, the RAI Group employs industry-leading filter technologies (including Double Verify, Grapeshot, Peer39, and IAS) to analyze website content and apply keyword and category restrictions to block its banner advertisements from appearing on third-party websites where youth-oriented and/or inappropriate content also may be present. The RAI Group also leverages other industry-leading technologies, such as Double Verify, Lotame, BlueKai, and Exelate, to publish its banner advertisements on third-party websites where active visitors have been identified as likely adult tobacco consumers based on browsing and/or purchasing history. Viewers who click on banner advertisements for VUSE products will be directed to the VUSE brand website, and as noted above, the RAI Group employs a full third-party KBA/SSN verification process before a 21+ adult tobacco consumer can register or make a purchase on the site.

*Television*. As with print and online advertising, the RAI Group has placement standards for VUSE television advertising so that such messages reach an overwhelmingly adult audience. Television commercials are placed only during programming where an independent third party such as Nielsen or Arbitron (or a similar third-party data service) has determined that viewership is composed of 85% or more adults 18 years old or older. Further, such advertising is restricted to programming content that is not directed to youth and that is relevant to audiences 21 years old or older.

*Direct Mail, E-Mail, Consumer Engagement*. The RAI Group utilizes certain direct-to-consumer communications (*e.g.*, direct mail, e-mail) for the VUSE brand. Prior to receiving any marketing materials or engagement, an adult tobacco or vapor consumer must be age verified by our third-party vendor.[20] The direct marketing database—and thus, all direct communications with adult tobacco consumers—is limited to existing adult tobacco consumers who certify that they are adult tobacco consumers, 21 or older, and that they want to receive communications from a tobacco company.

*Social Media*. As discussed in our October 11 meeting, the RAI Group has not marketed any of its tobacco products on social media platforms (*i.e.*., Facebook, Instagram, Twitter). While we have not used these social media platforms in the past, we may consider doing so in the future. If so, we will do so responsibly and explore the technological solutions available at that time to ensure that appropriate age verification is carried out to restrict youth access. However, the RAI Group commits not to market its products through social media "influencers."

In summary, we believe that RAI Group's marketing practices and restrictions with respect to VUSE products are substantial and appropriate, and indeed are more conservative than many

---

[20] For a discussion of our third-party age verification procedures, see Section I.C., above.

CONFIDENTIAL, NOT FOR PUBLIC DISCLOSURE

# TAB 6

Ex. B to Decl. of Christopher Junker, Excerpt of Deficiency Letter (Dec. 18, 2020)

PM0000638–PM0000643 and PM0000714–PM0000718 lack information to demonstrate that the new products would increase the likelihood of complete switching among adult smokers, compared to their tobacco or menthol varieties. In particular, your PMTAs included information showing that established cigarette smokers showed significantly greater interest in menthol and tobacco than all other flavors, while never users showed greater interest in mint, mango, and tropical flavors than menthol and tobacco and tobacco and menthol are not among the most appealing flavors to non-users. Flavored ENDS pose particular risks for youth initiation, as they are more likely to be used by youth ENDS users (compared to adults), are commonly cited as a reason for use, and have been shown to be associated with increased risk of progressing to regular ENDS use. Given the known risk to youth of marketing flavored ENDS, provide evidence to demonstrate that the use of these flavored products (other than menthol) increases the likelihood of complete switching among adult smokers relative to tobacco or menthol-flavored products. Provision of this information will enable FDA to better assess the impact of these products on population health. This information may include, but is not limited to:-

- Data or information from studies demonstrating uptake/switching among adult smokers using flavored variants of the products relative to uptake/switching among adult smokers using non-flavored (i.e. tobacco and menthol) variants.
- Data or information from studies demonstrating the level of underage appeal or use of these flavored variants.

**TAB 7**

Ex. C to Decl. of Christopher Junker,
Marketing Granted Order for Tobacco-
Flavored Vuse Solo (Oct. 12, 2021)

U.S. FOOD & DRUG
ADMINISTRATION

Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

October 12, 2021

**MARKETING GRANTED ORDERS**

R.J. Reynolds Vapor Company
Attention: Aaron P. Williams, Ph.D.
Senior Vice President, Scientific & Regulatory Affairs
RAI Services Company
401 North Main Street
Winston-Salem, NC 27101

**FDA Submission Tracking Numbers (STNs): PM0000551, PM0000553, PM0000560**

Dear Dr. Williams:

We completed review of your above-referenced PMTAs[1] and are issuing marketing granted orders for the tobacco products identified in Appendix A.

**Based on our review of your PMTAs, we determined that permitting the marketing of the new tobacco products, as described in your applications and specified in Appendix A, is appropriate for the protection of the public health. It should be noted that our determination that the marketing of these products is APPH is based on the submitted microbial stability data[2]. The issuance of these marketing granted orders confirms that you have met the requirements of section 910(c) of the FD&C Act and authorizes marketing of your new tobacco products.  Under the provisions of section 910, you may introduce or deliver for introduction into interstate commerce the tobacco products, in accordance with the marketing order requirements outlined in these orders, including all appendices.**

**The authority to market the new tobacco products under these orders is also contingent upon the conditions listed in these orders and subject to the requirements in the enclosed appendices.**

The requirements in these orders are intended to help ensure that the marketing of your products will continue to be appropriate for the protection of the public health, taking into account, among other factors, initiation among non-users, particularly youth. However, compliance with these requirements alone is not a guarantee that the marketing of the products will remain appropriate for the protection

---

[1] Premarket Tobacco Product Applications (PMTAs) submitted under section 910 of the Federal Food, Drug, and Cosmetic Act (FD&C Act)

[2] In your PMTAs, you stated that the shelf life of the subject products is (b) (4), but did not provide data that would allow FDA to evaluate whether the products are microbially stable over (b) (4).  The data provided support microbial stability of the products over (b) (4).  The stability data for (b) (4) is acceptable and there are no other stability concerns, so the lack of stability data fo (b) (4) does not preclude an APPH finding for the subject products. If you would like FDA to evaluate additional microbial stability data for a longer period, submit this information in a post-market report.

**A40**

of the public health, particularly if, despite these measures, there is a significant uptake in youth initiation, for example. FDA will continue to monitor the marketing of your products.

Based on our review of your PMTAs, the marketing restrictions in Appendix D are necessary to our conclusion that permitting the marketing of the new tobacco products is appropriate for the protection of the public health. Absent these restrictions, a marketing granted order for these applications could not issue consistent with the requirements of section 910(c) of the FD&C Act. Relatedly, we support certain aspects of your marketing plan, as described in your PMTAs, that are intended to help address the potential for youth use of your products. Specifically, you stated you intend to use the following measures to help reduce youth appeal of your marketing materials: "No testimonials by sports figures or celebrities or any person with special appeal to persons under 21 years of age; No person appearing in any advertising materials shall be under age 25 or be styled to look under age 25; Content shall not include characters, images, or themes designed to target youth; Content shall not be related to youth or youth-oriented activities; Content shall not suggest that use of R.J. Reynolds Vapor Company's ("RJRV") products is essential to social prominence, distinction, success or sexual attraction, nor shall any content picture a person using any RJRV products in an exaggerated manner; and Content shall not depict persons participating in, or obviously just having participated in, a physical activity requiring stamina or athletic conditioning beyond that of normal recreation." We encourage you to implement these measures because they are likely to help further mitigate risks to youth. We also recommend that you take additional steps to limit youth exposure to your print and point-of-sale advertising, including, for example, limiting advertising to print publications where 85% or more of the readership is 21 years of age or older and/or selecting publications that do not over-index for youth.

**Additionally, these orders are conditioned upon the products conforming with any applicable current or future tobacco product standards, unless specifically exempted under these orders or the product standard(s).**

Our finding that permitting the marketing of the new tobacco products is APPH does not mean FDA has "approved" the new tobacco products specified in Appendix A; therefore, you may not make any express or implied statement or representation in a label, labeling, or through the media or advertising, that the new tobacco products specified in Appendix A are approved by FDA (see Section 301(tt) of the FD&C Act).

The products subject to these marketing granted orders are subject to withdrawal or temporary suspension as described in section 910(d) of the FD&C Act.

You may be eligible to submit a supplemental PMTA for modification(s)[3] made to tobacco products that received marketing granted orders, by cross-referencing content in the PMTA and postmarket reports for the original tobacco products subject to this letter. Applicants that have questions about whether it would be appropriate to submit a supplemental PMTA for modification(s) they are seeking to implement should contact their Regulatory Health Project Manager (RHPM) within the Office of Science for more information.

We remind you that all regulated tobacco products, including the tobacco products specified in Appendix A, are subject to the requirements of the FD&C Act and its implementing regulations.

---

[3] We note that any modifications made to a tobacco product would render it a new tobacco product that would be subject to the premarket review requirements under section 910 of the FD&C Act.

**A41**

These requirements include, but are not limited to, annual registration, listing of products, listing of ingredients, reporting of harmful and potentially harmful constituents, and packaging, labeling, and advertising requirements. It is your responsibility to ensure the tobacco products specified in Appendix A comply with all applicable statutory and regulatory requirements. FDA will monitor your compliance with all applicable statutes and regulations.

In accordance with 40 CFR 1506.6, we will make your Environmental Assessment (EA) publicly available.

If you discontinue the manufacture, preparation, compounding or processing for commercial distribution of these tobacco products and later decide to reintroduce the products into the market, please contact the Office of Science prior to reintroduction.

We encourage you to submit all regulatory correspondence electronically via the CTP Portal[4,5] using eSubmitter.[6]  Alternatively, submissions may be mailed to:

> Food and Drug Administration
> Center for Tobacco Products
> Document Control Center (DCC)
> Building 71, Room G335
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993-0002

The CTP Portal and FDA's Electronic Submission Gateway (ESG) are generally available 24 hours a day, seven days a week; if the upload is successful, submissions are considered received by DCC on the day of upload.  Submissions delivered to DCC by courier or physical mail will be considered timely if received during delivery hours on or before the due date[7]; if the due date falls on a weekend or holiday, the delivery must be received on or before the preceding business day.  We are unable to accept regulatory submissions by e-mail.

---

[4] https://www.fda.gov/tobacco-products/manufacturing/submit-documents-ctp-portal
[5] FDA's Electronic Submission Gateway (ESG) is still available as an alternative to the CTP Portal.
[6] https://www.fda.gov/industry/fda-esubmitter
[7] https://www.fda.gov/tobacco-products/about-center-tobacco-products-ctp/contact-ctp

If you have any questions, please contact Barbara Banchero, Regulatory Health Project Manager, at (301) 796-1937 or Barbara.Banchero@fda.hhs.gov.

If you have any questions regarding postmarket activities for the tobacco products subject of these orders, please contact Lillian Ortega, Director, Division of Enforcement and Manufacturing, at CTP-OCE-Postmarket@fda.hhs.gov.

Sincerely,

Digitally signed by Matthew R. Holman -S
Date: 2021.10.12 10:54:57 -04'00'

Matthew R. Holman, Ph.D.
Director
Office of Science
Center for Tobacco Products

Enclosures:

Appendix A – New Tobacco Products Subject of This Letter
Appendix B – Postmarket Recordkeeping and Retention
Appendix C – Postmarket Reporting
Appendix D – Marketing Restrictions

Appendix A[8]

New Tobacco Products Subject of This Letter

| Common Attributes of PMTA | |
|---|---|
| Submission date | October 10, 2019 |
| Receipt date | October 17, 2019 |
| Applicant | R.J. Reynolds Vapor Company |
| Product manufacturer | R.J. Reynolds Vapor Company |
| Product category | ENDS (Electronic Nicotine Delivery System) |
| Attributes[9] | New Tobacco Product |
| STN | PM0000551 |
| Product name | Vuse Solo Power Unit |
| Product sub-category | ENDS Component |
| Package type | Paperboard Carton |
| Package quantity | 1 Power Unit |
| Characterizing flavor[10] | None |
| Additional properties | Length: 87 mm |
| | Diameter: 9.6 mm |
| | Battery capacity: ≥ 270 milliAmpere hours (mAh) |
| | Wattage: 3.00 W[11] |
| | Universal Serial Bus (USB) charger |
| STN | PM0000553 |
| Product name | Vuse Replacement Cartridge Original 4.8% G1[12] |
| Product sub- category | Closed E-cigarette |
| Package type | Paperboard Carton/Blister Pack |
| Package quantity | 2 Cartridges |
| Characterizing flavor | Original |
| Nicotine concentration | 57.4 mg/mL |
| E-liquid volume | 0.5 mL/cartridge |
| PG/VG ratio | 21/79 |
| Additional properties | Length: 37.6 mm |
| | Diameter: 9.6 mm |
| | G1 Tube Material: Stainless Steel |

---

[8] Brand/sub-brand or other commercial name used in commercial distribution.

[9] We interpret package type to mean container closure system and package quantity to mean product quantity within the container closure system, unless otherwise identified.

[10] Provided as part of product labeling

[11] The initial target wattage for a puff is (b) (4) % W for (b) (4) milliseconds, which then drops to a target of (b) (4) % W for the remainder of the puff duration

[12] The Vuse Solo "Original" e-liquid is a tobacco flavored e-liquid.

A44

| STN | PM0000560 |
|---|---|
| Product name | Vuse Replacement Cartridge Original 4.8% G2[12] |
| Product sub-category | Closed E- cigarette |
| Package type | Paperboard Carton/Blister Pack |
| Package quantity | 2 Cartridges |
| Characterizing flavor | Original |
| Nicotine concentration | 57.4 mg/mL |
| E-liquid volume | 0.5 mL/cartridge |
| PG/VG ratio | 21/79 |
| Additional properties | Length: 37.6 mm<br>Diameter: 9.6 mm<br>G2 Tube Material: (b) (4) |

A45

**Appendix B**

Postmarket Recordkeeping and Retention

Under section 910(f) of the FD&C Act, this order requires that you establish and maintain the records listed below. At any time during the retention period described in this order, FDA may request that you provide any of the documents described below. In addition, under section 704 of the FD&C Act, FDA may inspect your establishment(s) and request to inspect any record(s) described below.

The following records must be retained according to the retention periods described below. These records must be legible, in English, and available for inspection and copying by officers or employees duly designated by the Secretary, upon request.

| Record | Description | Retention Period |
|---|---|---|
| Prior PMTAs | Each PMTA submitted prior to marketing orders | 4 years from the date that FDA issues the marketing order |
| Postmarket reports | Postmarket reports, including periodic and adverse experience reports as described in this order | 4 years from the date the report was submitted to FDA or until FDA inspects the records, whichever occurs sooner |
| Correspondence with FDA | Correspondence with FDA pertaining to each authorized product | 4 years from the date of distribution of the last batch of each product subject to this order |
| Study data | Nonclinical or clinical study documentation including:<br>• Source data;<br>• Study protocols (including statistical analysis plan) and amendments showing the dates and reasons for each protocol revision;<br>• Institutional Review Board (IRB) or Independent Ethics Committee (IEC) approvals;<br>• Informed consent forms;<br>• Correspondence with study monitors/investigators/contract research organizations/sponsors/IRB/IEC;<br>• Investigator financial disclosure statements;<br>• Progress reports;<br>• Monitoring reports;<br>• Adverse experience reports;<br>• Case report forms/subject diaries/medical records/laboratory reports;<br>• Subject data line listings/observations records;<br>• Test article accountability records;<br>• Study results/protocol summaries/study reports; and<br>• Certifications and amendments to certifications | 4 years from the date of the order or 4 years from the conclusion of the study, whichever occurs later |

| Record | Description | Retention Period |
|---|---|---|
| Manufacturing records | Records pertaining to the manufacture, in process and release testing, production process (including any changes to the process, facility, or controls), packaging, storage, and stability monitoring and testing (including protocol and results)<br><br>Records and reports of all manufacturing deviations, investigations, and corrective and preventive actions including, but not limited to, those deviations associated with processing, testing, packing, labeling, storage, holding and distribution; and any deviation that may affect the characteristics of each final product | 4 years from the date of distribution of each batch of each product subject to this order |
| Sales and/or distribution records | A list of distributors and retailers of the products, including brick-and-mortar and digital[13] (including internet/online and mobile)<br><br>Any available information (not to include personally identifiable information) about product purchasers, such as purchasers' demographics (e.g., age, gender, race/ethnicity, geographic region) and previous or current use of other tobacco products (i.e., dual use)<br><br>With respect to individuals under the federal minimum age of sale of tobacco products, policies and procedures regarding restrictions on access to the products, including purchaser age and identity verification processes | 4 years from the date of distribution of each batch of each product subject to this order |
| Complaints | Records pertaining to any and all complaints associated with the tobacco product that is the subject of this order; such records may also include your analysis of those complaints | 4 years from the date of distribution of each batch of each product subject to this order |
| Health hazard analysis | Health hazard analyses, if performed voluntarily or directed by FDA | 4 years from the date of distribution of each batch of each product subject to this order |
| Labeling | Specimens of all labeling (including all labeling variations, such as those reflecting different required warnings), labels, inserts/onserts, instructions, and other accompanying information | 4 years from the date of initial dissemination to the public |
| Advertising, marketing and promotional materials and plans | Copies of all advertising, marketing, and/or promotional materials published, disseminated to consumers, or for use in engaging or communicating with consumers | 4 years from the date of initial dissemination to the public or implementation |

[13] For the purposes of this order, here and throughout the document, "digital" includes internet/online and mobile.

A47

| Record | Description | Retention Period |
|--------|-------------|------------------|
| | Copies of all advertising and marketing plans including strategic creative briefs and paid media plans, by channel and by product, and the details, dollar amount(s) and flighting of such plans, by channel and by product, including any:<br><br>• Use of competent and reliable data sources, methodologies, and technologies to establish, maintain, and monitor highly targeted advertising and marketing plans and media buys, including a list of all data sources used to target advertising and marketing plans and media buys;<br><br>• Targeting of specific group(s) by age-range(s), including young adults, ages 21-24, and other demographic or psychographic characteristics that reflect your intended audience(s), including the source(s) of such data;<br><br>• With respect to individuals under the federal minimum age of sale of tobacco products, actions taken to restrict access to the products and limit exposure to the products' labeling, advertising, marketing, and/or promotion;<br><br>• Use of owned, earned, shared, or paid media to create labeling for, advertise, market, and/or promote the products;<br><br>• Use of broadcast, satellite, or cable TV media, or broadcast or satellite radio media, including copies of media buy schedules pre-launch, program lists, projected percent audience compositions by age breakouts (i.e., 21+, 2-11, 12-17, 18-24, 25-54, 55+) by program, projected audience indices by age breakouts (i.e., 2-11, 12-17, 18-24, 25-54, 55+) by program, reach and frequency goals, and any other targeting or purchasing parameters;<br><br>• Use of partners, influencers, bloggers, or brand ambassadors to create labeling for, advertise, market, and/or promote the products;<br><br>• Consumer engagements – whether conducted by you, on your behalf, or at your direction -including events at which the products will be demonstrated and how access will be restricted to individuals at or above the federal minimum age of sale of tobacco products; or | |

| Record | Description | Retention Period |
|---|---|---|
| | • Use of public relations or other communications outreach to create labeling for, advertise, market, and/or promote the products

Copies of all records pertaining to the actual delivery of advertising impressions, including media tracking and optimization, by channel, by product (if applicable), by program (where applicable), and by audience demographics (e.g., age, gender, race/ethnicity, geographic region), media buy summaries, program lists, number of units by program, impressions by program, percent audience compositions by age breakouts (i.e., 21+, 2-11, 12-17, 18-24, 25-54, 55+) by program, audience indices by age breakouts (i.e., 2-11, 12-17, 18-24, 25-54, 55+) by program, reach and frequency, any other parameters purchased against the buying demographics, post-logs that verify TV/radio ads ran within the approved parameters, and post-launch delivery-verification reports for other paid media submitted to you or entities working on your behalf or at your direction from an accredited source

Policies and procedures for real-time digital media monitoring to identify, correct, and prevent delivery of advertising impressions to individuals under the federal minimum age of sale of tobacco products, including documentation of such monitoring activities and implementation of corrective and preventive measures | |
| Formative consumer research | Copies of any formative research studies conducted among any audiences, in the formation of the labeling, advertising, marketing, and/or promotional materials, including qualitative and quantitative research studies used to determine message effectiveness, consumer knowledge, attitudes, beliefs, intentions, and behaviors toward using the products, and including copies of the stimuli used in testing | 4 years after the studies are completed |
| Consumer evaluation research | Copies of any consumer evaluation research studies conducted among any audiences to determine the effectiveness of the labeling, advertising, marketing, and/or promotional materials and any shifts in consumer knowledge, attitudes, beliefs, intentions, and behaviors toward using the products, and including copies of the stimuli used in testing | 4 years after the studies are completed |

A49

| Record | Description | Retention Period |
|---|---|---|
| Contractual agreements | Copies of any contractual agreements regarding the creation or dissemination of the products' labeling, advertising, marketing, and/or promotional materials, including, for example, in print media, online or through digital platforms (e.g., social media and mobile applications), such as influencers, bloggers, and ambassadors, on your behalf, or at your direction | 4 years from the date of the contract or until the contract expires, whichever is later |

**Appendix C**
Postmarket Reporting

## I. Annual Reporting

Under section 910(f) of the FD&C Act, these orders require that you submit the following postmarket report to FDA on an annual basis, beginning twelve months from the date of the orders, to help FDA determine whether continued marketing of each new tobacco products **product/products** is appropriate for the protection of public health or whether there are or may be other grounds for withdrawing or temporarily suspending such orders. <u>For each 12-month reporting period</u>, the report must include:

1.  A single submission with a cover letter that includes the following subject line: **ANNUAL REPORT for PM0000551, PM0000553, PM0000560.** The cover letter should include the STN(s) and corresponding tobacco product name(s), applicant name, date of report, and reporting period;

2.  All final printed labeling (including all variations, such as those reflecting different required warnings) not previously submitted (e.g., if previously submitted under section 905(i) or previously submitted at the last reporting period and no changes were made, please list the date and manner of submission), including the date the labeling was first disseminated and the date when the labeling was discontinued, and a description of all changes to the labeling. The labeling must include all the panels and be presented in the actual size and color with legible text. The labeling must include labels, inserts/onserts, instructions, and any other accompanying information or materials for the products;

3.  All final full-color advertising, marketing, and/or promotional materials, published, disseminated to consumers, or for use in engaging or communicating with consumers not previously submitted (e.g., if previously submitted under 905(i) or previously submitted at the last reporting period and no changes were made, please list the date and manner of submission), along with the original date such materials were first disseminated and the date they were discontinued, and a description of all changes to the materials. The materials must be legible, include all panels where applicable (e.g., print ads, point of sale signs) and reflect the actual size and colors used. For any materials that would not fit on an 8.5" x 11" piece of paper, you may resize and submit electronic versions of such materials in a format that FDA can review and with sufficient resolution to allow FDA to read lettering clearly. If resizing the advertisement does not allow for text to be read easily, the complete text must be provided separately and clearly referenced. Digital media, such as videos and animations must be submitted in a format that FDA is able to open and review;

4.  A description of each change made to the manufacturing, facilities, or controls during the reporting period, including:
    a.  A comparison of each change to what was described in the PMTAs;
    b.  The rationale for making each change and, if any, a listing of any associated changes; and
    c.  The basis for concluding that each change does not result in a new tobacco product that is outside the scope of the marketing granted order;

**A51**

5. A summary of any stability monitoring, and testing of the products, including the monitoring and testing protocol(s) (including batch/lot sampling) and results;

6. A complete list of ongoing and completed studies about the tobacco products conducted by, or on your behalf, that have not been previously reported;

7. Full reports of information published or known to you, or which should be reasonably known to you, concerning scientific investigations and literature about the tobacco products that have not been previously reported, as well as significant findings from publications not previously reported;

8. A summary and analysis of all serious and unexpected adverse experiences associated with the tobacco products that have been reported to you or that you are aware of, accompanied by a statement of any changes to the overall risk associated with the tobacco products, and a summary of any changes in the health risks, including the nature and frequency of the adverse experience, and potential risk factors; A separate summary of all adverse experiences related to liver abnormalities, seizures or neurological symptoms, and respiratory symptoms characteristic of EVALI;

9. A summary of sales and distribution of the tobacco products for the reporting period, to the extent that you collect or receive such data, including:
    a. Total U.S. sales reported in dollars, units, and volume with breakdowns by U.S. census region, major retail markets, and channels in which the products are sold;
    b. The Universal Product Code that corresponds to the products identified in the PMTA; and
    c. Demographic characteristics of products purchasers, such as age, gender, race/ethnicity, geographic region, and tobacco use status;

10. A summary of the implementation and effectiveness of your policies and procedures regarding verification of the age and identity of purchasers of the products;

11. A summary of the implementation and effectiveness of your policies and procedures regarding restrictions on access to the products for individuals under the federal minimum age of sale of tobacco products;

12. A summary of all formative consumer research studies conducted– whether by you, on your behalf, or at your direction -among any audiences, in the formation of new labeling, advertising, marketing, and/or promotional materials, not previously submitted, including qualitative and quantitative research studies used to determine message effectiveness, consumer knowledge, attitudes, beliefs, intentions and behaviors toward using the products, and including the findings or these studies and copies of the stimuli used in testing;

13. A summary of all consumer evaluation research studies conducted – whether by you, on your behalf, or at your direction - among any audiences , not previously submitted, to determine the effectiveness of labeling, advertising, marketing, and/or promotional materials and shifts in consumer knowledge, attitudes, beliefs, intentions, and behaviors toward using the products, and including the findings of these studies and copies of the stimuli used in testing;

A52

14. A summary of the creation and dissemination of the products' labeling, advertising, marketing, and/or promotional materials – whether conducted by you, on your behalf, or at your direction – including a list of all entities involved and a description of their involvement, including a description of contractual agreements with such entities;

15. A description of the implementation of all advertising and marketing plans – whether conducted by you, on your behalf, or at your direction - not previously submitted, including strategic creative briefs and paid media plans by channel and by product, and the details, dollar amount(s) and flighting of such plans, by channel and by product, including a description of any:

   a. Use of competent and reliable data sources, methodologies, and technologies to establish, maintain, and monitor highly targeted advertising and marketing plans and media buys, including a list of all data sources used to target advertising and marketing plans and media buys;

   b. Targeting of specific group(s) by age-range(s), including young adults, ages 21-24, and other demographic or psychographic characteristics that reflect the intended audience(s), including the source(s) of such data;

   c. With respect to individuals under the federal minimum age of sale of tobacco products, actions taken to restrict access to the products and limit exposure to the products' labeling, advertising, marketing, and/or promotion;

   d. Use of owned, earned, shared, or paid media to create labeling for, advertise, market, and/or promote the products;

   e. Use of broadcast, satellite, or cable TV media, or broadcast or satellite radio media, including media buy summaries, program lists, number of units by program, program and network TRPs, impressions by program, percent audience compositions by age breakouts (i.e., 21+, 2-11, 12-17, 18-24, 25-54, 55+) by program, audience indices by age breakouts (i.e., 2-11, 12-17, 18-24, 25-54, 55+) by program, reach and frequency, any other parameters purchased against the buying demographics;

   f. Use of partners, influencers, bloggers, or brand ambassadors to create labeling for, advertise, market, and/or promote the products;

   g. Consumer engagements – whether conducted by you, on your behalf, or at your direction – including events at which the products were demonstrated and how access was restricted to individuals at or above the federal minimum age of sale of tobacco products; or

   h. Use of public-relations or other communications outreach to create labeling for, advertise, market, and/or promote the products; including the original date such plans were first used and the date they were discontinued, and a description of all changes to such plans since the last periodic report, by channel and by product;

16. A summary of media tracking and optimization, by channel, by product, and by audience demographics (e.g., age, gender, race/ethnicity, geographic region), including a summary of real-time digital media monitoring to identify, correct, and prevent delivery of advertising impressions to individuals under the federal minimum age of sale of tobacco products, and including a summary of implementation of any corrective and preventive measures, not previously submitted;

17. An analysis of the actual delivery of advertising impressions, by channel, by product (if applicable), by program (where applicable), and by audience demographics, (e.g., age, gender,

race/ethnicity, geographic region), not previously submitted, and verified against post-logs (for TV/radio) and post-launch delivery-verification reports for other paid media submitted to you or entities working on your behalf or at your direction from an accredited source; and

18. An overall assessment of how the marketing of the tobacco products continues to be appropriate for the protection of public health.

The products subject to these marketing granted orders are subject to withdrawal or temporary suspension as described in section 910(d) of the FD&C Act.  Grounds that FDA will consider for withdrawal under section 910(d) of the FD&C Act include scenarios in which FDA finds that the continued marketing of the product is no longer APPH. These scenarios may include, but are not limited to, certain changes in product use behaviors that were not expected in FDA's assessment of the PMTA (e.g., increases in the percentage or number of youth and young adults who report use of your products, fewer users of potentially more harmful products switching to your products than anticipated), changes in FDA's understanding of the net effects of your products on the population as a whole, or new scientific evidence that demonstrates that the products present a greater risk to health than FDA understood during the review process.

## II.  Serious and Unexpected Adverse Experiences Reporting and Reporting of Certain Manufacturing Deviations

Under section 910(f) of the FD&C Act, these orders require that you report to the FDA all adverse experiences that are both serious <u>and</u> unexpected and your analysis of the association between the adverse experience and each new tobacco product **within 15 calendar days** after the report is received by you.  These experiences may become known to you through any source including a customer complaint, request, or suggestion made as a result of an adverse experience, a manufacturing deviation analysis, tobacco product defect, or failure reported to you; or identified in the literature or media. Your information should be submitted with a cover letter that includes the following subject line: **SERIOUS UNEXPECTED ADVERSE EXPERIENCE REPORT for PM0000551, PM0000553, PM0000560**.

For purposes of reporting under these  orders, <u>serious adverse experience</u> means an adverse experience that results in *any* of the following outcomes:

- Death
- A life-threatening adverse event
- Inpatient hospitalization or prolongation of existing hospitalization
- A persistent or significant incapacity or substantial disruption in the ability to conduct normal life functions
- A congenital anomaly/birth defect
- Any other adverse experience that, based upon appropriate medical judgment, may jeopardize the health of a person and may require medical or surgical intervention to prevent one of the other outcomes listed in this definition

For purposes of reporting under these orders, <u>unexpected adverse experience</u> means an adverse experience occurring in one or more persons in which the nature, severity, or frequency of the experience is not consistent with *any* of the following:

- The known or foreseeable risks associated with the use or exposure to each tobacco product as described in the PMTA and other relevant sources of information, such as postmarket reports and studies
- The expected natural progression of any underlying disease, disorder, or condition of the persons(s) experiencing the adverse experience and the person's predisposing risk factor profile for the adverse experience
- The results of nonclinical laboratory studies

For products that have been distributed, if a manufacturing deviation occurs that you determine presents a reasonable probability that the tobacco product contains a manufacturing or other defect not ordinarily contained in tobacco products on the market that would cause serious, adverse health consequences or death you are required to report the deviation to FDA within 15 calendar days of identification.

## III. Notifications

Under sections 910(c)(1)(B) and 910(f) of the FD&C Act, **these orders** also require that, as of the authorization date of your marketing granted orders, you submit the following notifications of your marketing plans and materials to FDA. This requirement to submit the product's labeling, advertising, marketing, and promotional materials and plans in advance of their use is not for pre-approval — that is, FDA is not requiring that it review and approve such materials or plans before they may be used. Rather, such advance notification will provide FDA timely access to such materials and plans and, if needed, allow FDA to provide advisory comments, including any concerns about their possible impact on youth-appeal and tobacco use initiation. You may begin disseminating the materials 30 days after providing notification to FDA.

These notifications must be received by FDA **at least 30 days** prior to dissemination, which includes but is not limited to the publication, dissemination to consumers, or use in engaging or communicating with consumers of such materials. The duration of these notification requirements is as follows:

- On an ongoing basis, please provide notification of any labeling, advertising, marketing or promotion in broadcast, satellite, or cable TV media or broadcast or satellite radio media; and
- For a period of six months starting with the initial dissemination of the materials, provide notification of all other labeling, advertising, marketing, and promotion.

Each 30-day notification must include:

1. A single submission with a cover letter that includes the following subject line: **30-DAY NOTIFICATION for PM0000551, PM0000553, PM0000560**. The cover letter should include the STN(s) and corresponding tobacco product name(s), applicant name, date of notification, and planned dissemination date;

2. Full-color copies of all such labeling, advertising, marketing, and promotional materials for the products. The materials must be legible, include all panels where applicable (e.g., print ads, point of sale signs) and reflect the actual size and colors used. For any materials that would not fit on an 8.5" x 11" piece of paper, you may resize and submit electronic versions of such materials in a format that FDA can review and with sufficient resolution to allow FDA to read all

lettering clearly. If resizing the advertisement does not allow for text to be read easily, the complete text must be provided separately and clearly referenced; and

3. All advertising and marketing plans, including strategic creative briefs and paid media plans, by channel and by product, and the details, dollar amount(s) and flighting of such plans, by channel and by product, including any plans to:

  a. Use competent and reliable data sources, methodologies, and technologies to establish, maintain, and monitor highly targeted advertising and marketing plans and media buys, including a list of all data sources used to target advertising and marketing plans and media buys;

  b. Target specific group(s) by age-range(s), including young adults, ages 21-24, and other demographic or psychographic characteristics that reflect your intended audience(s), including the source(s) of such data;

  c. With respect to individuals below the federal minimum age of sale of tobacco products, take actions to restrict access to the products and limit exposure to the products' labeling, advertising, marketing, and/or promotion;

  d. Use owned, earned, shared, or paid media to create labeling for, advertise, market, and/or promote the products;

  e. Use broadcast, satellite, or cable TV media, or broadcast or satellite radio media, including copies of media buy schedules pre-launch, program lists, projected percent audience compositions by age breakouts (i.e., 21+, 2-11, 12-17, 18-24, 25-54, 55+) by program, projected audience indices by age breakouts (i.e., 21+, 2-11, 12-17, 18-24, 25-54, 55+) by program, reach and frequency goals, and any other targeting or purchasing parameters;

  f. Use partners, influencers, bloggers, or brand ambassadors to create labeling for, advertise, market, and/or promote the products;

  g. Conduct consumer engagements – whether by you, on your behalf, or at your direction – including events at which the products will be demonstrated and how access will be restricted to individuals at or above the federal minimum age of sale of tobacco products; or

  h. Use public-relations or other communications outreach to create labeling for, advertise, market, and/or promote the products.

## Appendix D
Marketing Restrictions

Under section 910(c)(1)(B) of the FD&C Act, these orders require you to:

- For any **digital sales** – whether conducted by you, on your behalf, or at your direction – establish, maintain, and monitor use of independent age- and identity-verification service(s) that compare customer information against independent, competent, and reliable data sources, such as public records, to prevent the sale of the products to individuals who are under the federal minimum age of sale of tobacco products.

- For any of the products' labeling, advertising, marketing, and/or promotion appearing in your **owned digital properties** (e.g., your company-owned, consumer-directed, product-branded website(s) and/or mobile applications) – whether conducted by you, on your behalf, or at your direction – establish, maintain, and monitor use of independent age- and identity-verification service(s) that compare customer information against independent, competent, and reliable data sources, such as public records, at the first point of access to such properties, to restrict access to such labeling, advertising, marketing, and/or promotion to only individuals who are at or above the federal minimum age of sale of tobacco products.

- For any of the products' labeling, advertising, marketing, and/or promotion appearing in any **shared digital properties** (e.g., your product-branded social media accounts, pages and associated content; content promoting your products on your behalf disseminated through another entity's social media accounts) – whether conducted by you, on your behalf, or at your direction – establish, maintain, and monitor use of the available site-, platform- and content- (e.g., post, video) specific age-restriction controls (e.g., age-restrict an entire product-branded account and all associated content disseminated through such account; ensure age-restriction of a specific video disseminated by an influencer promoting the products on your behalf through the influencer's account), at the first point of access to such properties, to restrict access to such labeling, advertising, marketing, and/or promotion to only individuals who are at or above the federal minimum age of sale of tobacco products.

- For any of the products' labeling, advertising, marketing, and/or promotion appearing in **paid digital media** (e.g., paid digital banner advertisements for the products running on another company's website; paid advertising for the products running in social media; paid distribution of influencer content; paid advertising in streaming/Over-The-Top video programming; paid advertising in streaming/internet radio content) – whether conducted by you, on your behalf, or at your direction:

  - Establish, maintain, and monitor use of competent and reliable data sources, methodologies, and technologies to precisely target delivery of such labeling, advertising, marketing, and/or promotion to only individuals who are at or above the federal minimum age of sale of tobacco products. Such targeting must use only first- and/or second-party age-verified data, where:

    - "First-party" age-verified data is data owned by you (e.g., your customer registration data collected via site traffic to your company-owned website; data you use in direct

marketing to your adult smoking customers) that you have age-verified through independent, competent, and reliable data sources; and

- ■ "Second-party" age-verified data is first-party data owned and age-verified by another competent and reliable entity (e.g., another company's first-party user registration data) to which you have access. Such data must be age-verified by the second party.

- ■ "First-party" and "second-party" data does not include data obtained from data aggregators who categorize consumers based on trackable activities and inferred interests (e.g., internet search terms, video interactions, browsing history, purchasing behaviors) to create demographic and psychographic profiles marketers may use to enhance audience targeting. Such data is not considered age-verified and can only be used in combination with first- and/ or second-party age-verified data.

- For any of the products' labeling, advertising, marketing, and/or promotion appearing **in broadcast, satellite, or cable TV media, and/or broadcast or satellite radio media** (e.g., video advertisements for the products airing during broadcast cable television programming; audio advertisements for the products airing through radio media channels; ads airing via multichannel video programming distributors; ads airing during Video on Demand/Full Episode Player extensions to network buys; addressable TV ads) – whether conducted by you, on your behalf, or at your direction:

  - o Establish, maintain, and monitor use of independent, competent, and reliable data sources, methodologies, and technologies to target delivery of such labeling, advertising, marketing, and/ or promotion to individuals who are at or above the federal minimum age of sale of tobacco products. Such targeting must adhere to the following requirements, at a minimum:

    - ■ All TV and radio programs must have reported audience compositions of 85% or more adults who are at or above the federal minimum age of sale of tobacco products;

    - ■ All TV and radio programs must have reported audience indices of 99 or lower for youth aged 2-11; and

    - ■ All TV and radio programs must have reported audience indices of 99 or lower for youth aged 12-17..

- Establish, maintain, and monitor use of competent and reliable data sources, methodologies, and technologies (e.g., using an embedded tracking pixel in all digital advertising) – whether conducted by you, on your behalf, or at your direction – to **track and measure actual delivery of all advertising impressions**, by channel, by product, and by audience demographics (e.g., age, gender, race/ethnicity, geographic region). Such monitoring requires real-time digital media tracking, and identifying, correcting, and preventing delivery of advertising impressions to individuals under the federal minimum age of sale of tobacco products. Such monitoring also requires post-logs that verify TV/radio ads ran within the approved parameters and post-launch delivery verification reports for other paid media be submitted to you or entities working on your behalf or at your direction from an accredited source.

- For any use of **partners, influencers, bloggers, and/or brand ambassadors** to create labeling for, advertise, market, and/or promote the products – whether conducted by you, on your behalf, or at your direction – disclose to consumers or viewers, via the use of statements such as "sponsored by [firm name]" in such labeling, advertising, marketing, and/or promotional materials, any relationships between you and entities that create labeling for, advertise, market, and/or promote the products, on your behalf, or at your direction.

The marketing restrictions in these orders were determined based on review of the information submitted in your PMTAs, including information about how you intend to advertise and market the products, and in consideration of other marketing restrictions that currently apply to and/or affect the marketing of your products, including policies and practices of media entities (e.g., no broadcast TV network currently accepts tobacco advertising). Any change in the policies or practices of media entities that has the effect of expanding opportunities for manufacturers of tobacco products to reach youth and any subsequent changes in your use of such media entities may, in turn, affect the APPH analysis of your products, based on our obligation to consider how products are likely to be used, including by youth.

**A59**

**TAB 8**

Ex. D to Decl. of Christopher Junker,
Marketing Granted Order for Tobacco-
Flavored Vuse Vibe and Ciro
(May 12, 2022)

U.S. FOOD & DRUG
ADMINISTRATION

Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

**MARKETING GRANTED ORDERS**

R.J. Reynolds Vapor Company
Attention:  Aaron P. Williams, Ph.D.
Senior Vice President, Scientific & Regulatory Affairs
RAI Services Company
401 North Main Street
Winston-Salem, NC 27101

**FDA Submission Tracking Numbers (STNs):**  Multiple STNs, see Appendix A

Dear Dr. Williams:

We completed review of your PMTAs[1] and are issuing marketing granted orders for the tobacco products identified in Appendix A.

**Based on our review of your PMTAs, we determined that permitting the marketing of the new tobacco products, as described in your applications and specified in Appendix A, are appropriate for the protection of the public health (APPH). It should be noted that our determination that the marketing of these products is APPH is based in part on the submitted microbial stability data[2]. The issuance of these marketing granted orders confirms that you have met the requirements of section 910(c) of the FD&C Act and authorizes marketing of your new tobacco products. Under the provisions of section 910, you may introduce or deliver for introduction into interstate commerce the tobacco products, in accordance with the marketing order requirements outlined in these orders, including all appendices.**

**The authority to market the new tobacco products under these orders are also contingent upon the conditions listed in these orders and subject to the requirements in the enclosed appendices.**

The requirements in these orders are intended to help ensure that the marketing of your products will continue to be appropriate for the protection of the public health, taking into account, among other factors, initiation among non-users, particularly youth. However, compliance with these requirements alone is not a guarantee that the marketing of the products will remain appropriate for the protection of the public health, particularly if, despite these measures, there is a significant uptake in youth initiation, for example. FDA will continue to monitor the marketing of your products.

---

[1] Premarket Tobacco Product Applications (PMTAs) submitted under section 910 of the Federal Food, Drug, and Cosmetic Act (FD&C Act)

[2] For PM0000636 and PM0000712, you stated that the shelf life of the subject products is (b) (4)   but did not provide data that would allow FDA to evaluate whether the products are microbially stable over (b) (4)   . The data provided support microbial stability of the products over (b) (4)   . The stability data for (b) (4)   is acceptable and there are no other stability concerns, so the lack of stability data for (b) (4)   does not preclude an APPH finding for the subject products. If you would like FDA to evaluate additional microbial stability data for a longer period, submit this information in a post-market report.

Based on our review of your PMTAs, the marketing restrictions in Appendix D are necessary to our conclusion that permitting the marketing of the new tobacco products is appropriate for the protection of the public health. Absent these restrictions, a marketing granted order for these applications could not issue consistent with the requirements of section 910(c) of the FD&C Act. Relatedly, we support certain aspects of your marketing practices, as described in your PMTAs, that are intended to help address the potential for youth use of your products. Specifically, you stated you intend to use the following measures to help reduce youth appeal of your marketing materials: "Not use any social media platforms (e.g., Facebook, Instagram, Twitter) or social media influencers for marketing and promotional purposes; No testimonials by sports figures or celebrities or any person with special appeal to persons under 21 years of age; No person appearing in any advertising materials shall be under age 25 or be styled to look under age 25; Content shall not include characters, images, or themes designed to target youth; Content shall not be related to youth or youth-oriented activities; Content shall not suggest that use of R.J. Reynolds Vapor Company's ("RJRV") products is essential to social prominence, distinction, success or sexual attraction, nor shall any content picture a person using any RJRV products in an exaggerated manner; and Content shall not depict persons participating in, or obviously just having participated in, a physical activity requiring stamina or athletic conditioning beyond that of normal recreation." We also support your proposed efforts to ensure responsible retailing practices intended to prevent underage sales to minors, plans to age-verify tobacco consumers opting-in to receive direct mail/e-mail marketing, and plans to conduct age- and identity-verification of consumers participating in engagement events. We encourage you to implement these measures because they are likely to help further mitigate risks to youth. We also recommend that you take additional steps to limit youth exposure to your print and point-of-sale advertising, including, for example, limiting advertising to print publications that do not over-index for youth, requiring advertising to be placed inside the store, and placing product displays near other age-restricted products and away from products appealing to youth like toys and candy.

**Additionally, these orders are conditioned upon the products conforming with any applicable current or future tobacco product standards, unless specifically exempted under these orders or the product standard(s).**

Our finding that permitting the marketing of the new products is APPH does not mean FDA has "approved" the new tobacco products specified in Appendix A; therefore, you may not make any express or implied statement or representation in a label, labeling, or through the media or advertising, that the new tobacco products specified in Appendix A are approved by FDA (see Section 301(tt) of the FD&C Act).

The products subject to these marketing granted orders are subject to withdrawal or temporary suspension as described in section 910(d) of the FD&C Act.

You may be eligible to submit a supplemental PMTA, in accordance with 21 C.F.R. § 1114.15, for modification(s)[3] made to tobacco products that received marketing granted orders, by cross-referencing content in the PMTA and postmarket reports for the original tobacco products subject to this letter. Applicants that have questions about whether it would be appropriate to submit a supplemental PMTA for modification(s) they are seeking to implement should contact their Regulatory Health Project Manager (RHPM) within the Office of Science for more information.

---

[3] We note that any modifications made to a tobacco product would render it a new tobacco product that would be subject to the premarket review requirements under section 910 of the FD&C Act.

**A61**

We remind you that all regulated tobacco products, including the tobacco products specified in Appendix A, are subject to the requirements of the FD&C Act and its implementing regulations. These requirements include, but are not limited to, annual registration, listing of products, listing of ingredients, reporting of harmful and potentially harmful constituents, packaging, labeling, and advertising requirements. It is your responsibility to ensure the tobacco products specified in Appendix A comply with all applicable statutory and regulatory requirements. FDA will monitor your compliance with all applicable statutes and regulations.

In accordance with 40 CFR 1506.6, we will make your Environmental Assessment (EA) publicly available.

If you discontinue the manufacture, preparation, compounding or processing for commercial distribution of these tobacco products and later decide to reintroduce the products into the market, please contact the Office of Science prior to reintroduction.

We encourage you to submit all regulatory correspondence electronically via the CTP Portal[4,5] using eSubmitter.[6] Alternatively, submissions may be mailed to:

> Food and Drug Administration
> Center for Tobacco Products
> Document Control Center (DCC)
> Building 71, Room G335
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993-0002

The CTP Portal and FDA's Electronic Submission Gateway (ESG) are generally available 24 hours a day, seven days a week; if the upload is successful, submissions are considered received by DCC on the day of upload. Submissions delivered to DCC by courier or physical mail will be considered timely if received during delivery hours on or before the due date[7]; if the due date falls on a weekend or holiday, the delivery must be received on or before the preceding business day. We are unable to accept regulatory submissions by e-mail.

---

[4] https://www.fda.gov/tobacco-products/manufacturing/submit-documents-ctp-portal
[5] FDA's Electronic Submission Gateway (ESG) is still available as an alternative to the CTP Portal.
[6] https://www.fda.gov/industry/fda-esubmitter
[7] https://www.fda.gov/tobacco-products/about-center-tobacco-products-ctp/contact-ctp

If you have any questions, please contact Sequoia Bacon, Regulatory Health Project Manager, at (301) 796-0736 or Sequoia.Bacon@fda.hhs.gov.

If you have any questions regarding postmarket activities for the tobacco products subject of this order, please contact Lillian Ortega, Director, Division of Enforcement and Manufacturing, at CTP-OCE-Postmarket@fda.hhs.gov.

Sincerely,

/S/

Matthew R. Holman, Ph.D.
Director
Office of Science
Center for Tobacco Products

Enclosures:

Appendix A – New Tobacco Products Subject of This Letter
Appendix B – Postmarket Recordkeeping and Retention
Appendix C – Postmarket Reporting
Appendix D – Marketing Restrictions

**Appendix A[8]**
New Tobacco Products Subject of This Letter

| Common Attributes of PMTAs | |
|---|---|
| Applicant | R.J. Reynolds Vapor Company |
| Product manufacturer | R.J. Reynolds Vapor Company |
| Product category | ENDS (VAPES) |
| **Attributes** | **New Tobacco Product** |
| **STN** | **PM0000635** |
| Submission date | April 2, 2020 |
| Receipt date | April 2, 2020 |
| Product name | Vuse Vibe Power Unit |
| Product subcategory | Closed E-Cigarette |
| Package type | Paperboard Carton |
| Package quantity | 1 Power Unit |
| Characterizing flavor [9] | Unflavored |
| Additional properties | Length: 82.5 mm<br>Diameter: 13.0 mm<br>Wattage:[10] (b) (4) W<br>Battery capacity: (b) (4) milliAmpere hour (mAh)<br>Universal Serial Bus (USB) Charger<br>Battery Manufacturer: (b) (4) |
| **STN** | **PM0000636** |
| Submission date | April 2, 2020 |
| Receipt date | April 2, 2020 |
| Product name | Vuse Vibe Tank Original 3.0% |
| Product subcategory | Closed E-Liquid |
| Package type | Paperboard Carton/Blister Pack |
| Package quantity | 2 Cartridges |
| Characterizing flavor | Tobacco[11] |
| E-liquid volume | 1.9 mL per cartridge |
| Nicotine concentration | 36.0 mg/mL |
| PG/VG ratio | 20/80 |
| Additional properties | Length: 59.0 mm<br>Diameter: 13.0 mm<br>Nicotine content: 3.0% w/w |

---

[8] Brand/sub-brand or other commercial name used in commercial distribution.

[9] Provided as part of product label.

[10] The applicant states the wattage listed represents the nominal operating range; the upper and lower wattages have a variation of (b) (4) %.

[11] Labels may contain descriptive term such as "Original."

| Attributes | New Tobacco Product |
|---|---|
| **STN** | **PM0000646** |
| Submission date | April 15, 2020 |
| Receipt date | April 15, 2020 |
| Product name | Vuse Ciro Power Unit |
| Product subcategory | Closed E-Cigarette |
| Package type | Paperboard Carton |
| Package quantity | 1 Power Unit |
| Characterizing flavor[9] | Unflavored |
| Additional properties | Length: 83.5 mm<br>Diameter: 9.2 mm<br>Battery Capacity:(b) (4) milliAmpere hour (mAh)<br>Wattage:[12] Expected High: (b) (4)    W<br>             Expected Low: (b) (4)    W<br>Universal Serial Bus (USB) Charger<br>Battery Manufacturer: (b) (4) |
| **STN** | **PM0000712** |
| Submission date | April 15, 2020 |
| Receipt date | April 15, 2020 |
| Product name | Vuse Ciro Cartridge Original 1.5% |
| Product subcategory | Closed E-Liquid |
| Package type | Paperboard Carton/Blister Pack |
| Package quantity | 3 Cartridges |
| Characterizing flavor | Tobacco[11] |
| Nicotine concentration | 17.7 mg/ml |
| PG/VG ratio | 29/71 |
| E-liquid volume | 0.9 ml per cartridge |
| Additional properties | Length: 50.0 mm<br>Diameter: 9.2 mm<br>Nicotine Content: 1.5% |
| **STN** | **PM0004287** |
| Submission date | April 2, 2020 |
| Receipt date | April 2, 2020 |
| Product name | Vuse Vibe Power Unit |
| Product subcategory | Closed E-Cigarette |
| Package type | Paperboard Carton |
| Package quantity | 1 Power Unit |
| Characterizing flavor[9] | Unflavored |
| Additional property | Length: 82.5 mm<br>Diameter: 13.0 mm<br>Wattage:[10] (b) (4) W<br>Battery capacity:(b) (4) milliAmpere hour (mAh)<br>Universal Serial Bus (USB) Charger<br>Battery Manufacturer: (b) (4) |

---

[12] The wattages listed represent the average of 15 samples ± 95% confidence interval.

| Attributes | New Tobacco Product |
|---|---|
| **STN** | **PM0004293** |
| Submission date | April 15, 2020 |
| Receipt date | April 15, 2020 |
| Product name | Vuse Ciro Power Unit |
| Product subcategory | Closed E-Cigarette |
| Package type | Paperboard Carton |
| Package quantity | 1 Power Unit |
| Characterizing flavor[9] | Unflavored |
| Additional property | Length: 83.5 mm<br>Diameter: 9.2 mm<br>Wattage:[12] Expected High: (b) (4)    W<br>Expected Low: (b) (4)    W<br>Battery capacity: (b) (4) milliAmpere hour (mAh)<br>Universal Serial Bus (USB) Charger<br>Battery Manufacturer: (b) (4) |

**Appendix B**
Postmarket Recordkeeping and Retention

Under section 910(f) of the FD&C Act, this order requires that you establish and maintain the records listed below . At any time during the retention period described in this order, FDA may request that you provide any of the documents described below. In addition, under section 704 of the FD&C Act, FDA may inspect your establishment(s) and request to inspect any record(s) described below.

The following records must be retained according to the retention periods described below. These records must be legible, in English, and available for inspection and copying by officers or employees duly designated by the Secretary, upon request.

| Record | Description | Retention Period |
|---|---|---|
| Prior PMTAs | Each PMTA submitted prior to marketing orders | 4 years from the date that FDA issues the marketing order |
| Postmarket reports | Postmarket reports, including periodic and adverse experience reports as described in this order | 4 years from the date the report was submitted to FDA or until FDA inspects the records, whichever occurs sooner |
| Correspondence with FDA | Correspondence with FDA pertaining to each authorized product | 4 years from the date of distribution of the last batch of each product subject to this order |
| Study data | Nonclinical or clinical study documentation including:<br>• Source data;<br>• Study protocols (including statistical analysis plan) and amendments showing the dates and reasons for each protocol revision;<br>• Institutional Review Board (IRB) or Independent Ethics Committee (IEC) approvals;<br>• Informed consent forms;<br>• Correspondence with study monitors/investigators/contract research organizations/ sponsors/IRB/IEC;<br>• Investigator financial disclosure statements;<br>• Progress reports;<br>• Monitoring reports;<br>• Adverse experience reports; | 4 years from the date of the order or 4 years from the conclusion of the study, whichever occurs later |

| Record | Description | Retention Period |
|---|---|---|
| | • Case report forms/subject diaries/medical records/laboratory reports; <br> • Subject data line listings/observations records; <br> • Test article accountability records; <br> • Study results/protocol summaries/study reports; and <br> • Certifications and amendments to certifications | |
| Manufacturing records | Records pertaining to the manufacture, in process and release testing, production process (including any changes to the process, facility, or controls), packaging, storage, and stability monitoring and testing (including protocol and results) <br><br> Records and reports of all manufacturing deviations, investigations, and corrective and preventive actions including, but not limited to, those deviations associated with processing, testing, packing, labeling, storage, holding and distribution; and any deviation that may affect the characteristics of each final product | 4 years from the date of distribution of each batch of each product subject to this order |
| Sales and/or distribution records | A list of distributors and retailers of the products, including brick-and-mortar and digital[13] (including internet/online and mobile) <br><br> Any available information (not to include personally identifiable information) about product purchasers, such as purchasers' demographics (e.g., age, gender, race/ethnicity, geographic region) and previous or current use of other tobacco products (i.e., dual use) <br><br> With respect to individuals under the federal minimum age of sale of tobacco products, policies, and procedures regarding restrictions on access to the products, including purchaser age and identity verification processes | 4 years from the date of distribution of each batch of each product subject to this order |

---

[13] For the purposes of this order, here and throughout the document, "digital" includes internet/online and mobile.

| Record | Description | Retention Period |
|---|---|---|
| Complaints | Records pertaining to any and all complaints associated with the tobacco product that is the subject of this order; such records may also include your analysis of those complaints | 4 years from the date of distribution of each batch of each product subject to this order |
| Health hazard analysis | Health hazard analyses, if performed voluntarily or directed by FDA | 4 years from the date of distribution of each batch of each product subject to this order |
| Labeling | Specimens of all labeling (including all labeling variations, such as those reflecting different required warnings), labels, inserts/onserts, instructions, and other accompanying information | 4 years from the date of initial dissemination to the public |
| Advertising, marketing and promotional materials and plans | Copies of all advertising, marketing, and/or promotional materials published, disseminated to consumers, or for use in engaging or communicating with consumers<br><br>Copies of all advertising and marketing plans including strategic creative briefs and paid media plans, by channel and by product, and the details, dollar amount(s) and flighting of such plans, by channel and by product, including any:<br>• Use of competent and reliable data sources, methodologies, and technologies to establish, maintain, and monitor highly targeted advertising and marketing plans and media buys, including a list of all data sources used to target advertising and marketing plans and media buys;<br>• Targeting of specific group(s) by age-range(s), including young adults, ages 21-24, and other demographic or psychographic characteristics that reflect your intended audience(s), including the source(s) of such data;<br>• With respect to individuals under the federal minimum age of sale of tobacco products, actions taken to restrict access to the products and limit exposure to | 4 years from the date of initial dissemination to the public or implementation |

| Record | Description | Retention Period |
|---|---|---|
| | the products' labeling, advertising, marketing, and/or promotion; | |
| | • Use of owned, earned, shared, or paid media to create labeling for, advertise, market, and/or promote the products; | |
| | • Use of broadcast, satellite, or cable TV media, or broadcast or satellite radio media, including copies of media buy schedules pre-launch, program lists, projected percent audience compositions by age breakouts (i.e., 21+, 2-11, 12-17, 18-24, 25-54, 55+) by program, projected audience indices by age breakouts (i.e., 2-11, 12-17, 18-24, 25-54, 55+) by program, reach and frequency goals, and any other targeting or purchasing parameters; | |
| | • Use of partners, influencers, bloggers, or brand ambassadors to create labeling for, advertise, market, and/or promote the products; | |
| | • Consumer engagements – whether conducted by you, on your behalf, or at your direction -including events at which the products will be demonstrated and how access will be restricted to individuals at or above the federal minimum age of sale of tobacco products; or | |
| | • Use of public relations or other communications outreach to create labeling for, advertise, market, and/or promote the products | |
| | Copies of all records pertaining to the actual delivery of advertising impressions, including media tracking and optimization, by channel, by product (if applicable), by program (where applicable), and by audience demographics (e.g., age, gender, race/ethnicity, geographic region), media buy summaries, program lists, number of units by program, impressions by program, percent audience compositions by age breakouts (i.e., 21+, 2-11, 12-17, 18-24, 25-54, 55+) by | |

| Record | Description | Retention Period |
|---|---|---|
| | program, audience indices by age breakouts (i.e., 2-11, 12-17, 18-24, 25-54, 55+) by program, reach and frequency, any other parameters purchased against the buying demographics, post-logs that verify TV/radio ads ran within the approved parameters, and all post-launch delivery-verification reports for other paid media submitted to you or entities working on your behalf or at your direction from an accredited source<br><br>Policies and procedures for real-time digital media monitoring to identify, correct, and prevent delivery of advertising impressions to individuals under the federal minimum age of sale of tobacco products, including documentation of such monitoring activities and implementation of corrective and preventive measures | |
| Formative consumer research | Copies of any formative research studies conducted among any audiences, in the formation of the labeling, advertising, marketing, and/or promotional materials, including qualitative and quantitative research studies used to determine message effectiveness, consumer knowledge, attitudes, beliefs, intentions, and behaviors toward using the products, and including copies of the stimuli used in testing | 4 years after the studies are completed |
| Consumer evaluation research | Copies of any consumer evaluation research studies conducted among any audiences to determine the effectiveness of the labeling, advertising, marketing, and/or promotional materials and any shifts in consumer knowledge, attitudes, beliefs, intentions, and behaviors toward using the products, and including copies of the stimuli used in testing | 4 years after the studies are completed |
| Contractual agreements | Copies of any contractual agreements regarding the creation or dissemination of the products' labeling, advertising, marketing, and/or promotional materials, including, for example, in print media, online or through digital platforms (e.g., social media and mobile applications), such | 4 years from the date of the contract or until the contract expires, whichever is later |

A71

| Record | Description | Retention Period |
|---|---|---|
| | as influencers, bloggers, and ambassadors, on your behalf, or at your direction | |

**Appendix C**
Postmarket Reporting

### I.    Annual Reporting

Under section 910(f) of the FD&C Act, these orders require that you submit the following postmarket reports to FDA on an annual basis, beginning twelve months from the date of the order to help FDA determine whether continued marketing of each new tobacco products is appropriate for the protection of public health or whether there are or may be other grounds for withdrawing or temporarily suspending such order. For each 12-month reporting period, the report must include:

1. A single submission with a cover letter that includes the following subject line:  **ANNUAL REPORT for PM0000635, PM0000636, PM0000646, PM0000712, PM0004287, PM0004293.** The cover letter should include the STN(s) and corresponding tobacco product name(s), applicant name, date of report, and reporting period, and marketing status outside the United States;

2. All final printed labeling (including all variations, such as those reflecting different required warnings) not previously submitted (e.g., if previously submitted under section 905(i) or previously submitted at the last reporting period and no changes were made, please list the date and manner of submission), including the date the labeling was first disseminated and the date when the labeling was discontinued, and a description of all changes to the labeling. The labeling must include all the panels and be presented in the actual size and color with legible text. The labeling must include labels, inserts/onserts, instructions, and any other accompanying information or materials for the products;

3. All final full-color advertising, marketing, and/or promotional materials, published, disseminated to consumers, or for use in engaging or communicating with consumers not previously submitted (e.g., if previously submitted under 905(i) or previously submitted at the last reporting period and no changes were made, please list the date and manner of submission) along with the original date such materials were first disseminated and the date they were discontinued, and a description of all changes to the materials. The materials must be legible, include all panels where applicable (e.g., print ads, point of sale signs) and reflect the actual size and colors used. For any materials that would not fit on an 8.5" x 11" piece of paper, you may resize and submit electronic versions of such materials in a format that FDA can review and with sufficient resolution to allow FDA to read lettering clearly. If resizing the advertisement does not allow for text to be read easily, the complete text must be provided separately and clearly referenced. Digital media, such as videos and animations must be submitted in a format that FDA is able to open and review;

4. A description of each change made to the manufacturing, facilities, or controls during the reporting period, including:
    a. A comparison of each change to what was described in the PMTAs;
    b. The rationale for making each change and, if any, a listing of any associated changes; and
    c. The basis for concluding that each change does not result in a new tobacco product that is outside the scope of the marketing granted order.

**A73**

5. A summary of any stability monitoring, and testing of the products, including the monitoring and testing protocol(s) (including batch/lot sampling) and results;

6. A complete list of ongoing and completed studies about the tobacco products conducted by, or on your behalf, that have not been previously reported;

7. Full reports of information published or known to you, or which should be reasonably known to you, concerning scientific investigations and literature about the tobacco products that have not been previously reported, as well as significant findings from publications not previously reported;

8. A summary and analysis of all serious and unexpected adverse experiences associated with the tobacco products that have been reported to you or that you are aware of, accompanied by a statement of any changes to the overall risk associated with the tobacco products, and a summary of any changes in the health risks, including the nature and frequency of the adverse experience, and potential risk factors; A separate summary of all adverse experiences related to seizures or neurological symptoms, and respiratory symptoms characteristic of EVALI;

9. A summary of sales and distribution of the tobacco products for the reporting period, to the extent that you collect or receive such data, including:
    a. Total U.S. sales reported in dollars, units, and volume with breakdowns by U.S. census region, major retail markets, and channels in which the products are sold;
    b. The Universal Product Code that corresponds to the products identified in the PMTA; and
    c. Demographic characteristics of products purchasers, such as age, gender, race/ethnicity, geographic region, and tobacco use status;

10. A summary of the implementation and effectiveness of your policies and procedures regarding verification of the age and identity of purchasers of the products;

11. A summary of the implementation and effectiveness of your policies and procedures regarding restrictions on access to the products for individuals under the federal minimum age of sale of tobacco products;

12. A summary of all formative consumer research studies conducted– whether by you, on your behalf, or at your direction -among any audiences, in the formation of new labeling, advertising, marketing, and/or promotional materials, not previously submitted, including qualitative and quantitative research studies used to determine message effectiveness, consumer knowledge, attitudes, beliefs, intentions and behaviors toward using the products, and including the findings or these studies and copies of the stimuli used in testing;

13. A summary of all consumer evaluation research studies conducted – whether by you, on your behalf, or at your direction - among any audiences, not previously submitted, to determine the effectiveness of labeling, advertising, marketing, and/or promotional materials and shifts in consumer knowledge, attitudes, beliefs, intentions, and behaviors toward using the products, and including the findings of these studies and copies of the stimuli used in testing;

A74

14. A summary of the creation and dissemination of the products' labeling, advertising, marketing, and/or promotional materials – whether conducted by you, on your behalf, or at your direction – including a list of all entities involved and a description of their involvement, including a description of contractual agreements with such entities;

15. A description of the implementation of all advertising and marketing plans – whether conducted by you, on your behalf, or at your direction - not previously submitted, including strategic creative briefs and paid media plans by channel and by product, and the details, dollar amount(s) and flighting of such plans, by channel and by product, including a description of any:
    a. Use of competent and reliable data sources, methodologies, and technologies to establish, maintain, and monitor highly targeted advertising and marketing plans and media buys, including a list of all data sources used to target advertising and marketing plans and media buys;
    b. Targeting of specific group(s) by age-range(s), including young adults, ages 21-24, and other demographic or psychographic characteristics that reflect the intended audience(s), including the source(s) of such data;
    c. With respect to individuals under the federal minimum age of sale of tobacco products, actions taken to restrict access to the products and limit exposure to the products' labeling, advertising, marketing, and/or promotion;
    d. Use of owned, earned, shared, or paid media to create labeling for, advertise, market, and/or promote the products;
    e. Use of broadcast, satellite, or cable TV media, or broadcast or satellite radio media, including media buy summaries, program lists, number of units by program, program and network TRPs, impressions by program, percent audience compositions by age breakouts (i.e., 21+, 2-11, 12-17, 18-24, 25-54, 55+) by program, audience indices by age breakouts (i.e., 2-11, 12-17, 18-24, 25-54, 55+) by program, reach and frequency, any other parameters purchased against the buying demographics;
    f. Use of partners, influencers, bloggers, and/or brand ambassadors to create labeling for, advertise, market, and/or promote the products;
    g. Consumer engagements – whether conducted by you, on your behalf, or at your direction – including events at which the products were demonstrated and how access was restricted to individuals at or above the federal minimum age of sale of tobacco products; or
    h. Use of public-relations or other communications outreach to create labeling for, advertise, market, and/or promote the products; including the original date such plans were first used and the date they were discontinued, and a description of all changes to such plans since the last periodic report, by channel and by product;

16. A summary of media tracking and optimization, by channel, by product, and by audience demographics (e.g., age, gender, race/ethnicity, geographic region), including a summary of real-time digital media monitoring to identify, correct, and prevent delivery of advertising impressions to individuals under the federal minimum age of sale of tobacco products, and including a summary of implementation of any corrective and preventive measures, not previously submitted;

17. An analysis of the actual delivery of advertising impressions, by channel, by product (if applicable), by program (where applicable), and by audience demographics, (e.g., age, gender,

race/ethnicity, geographic region), not previously submitted, and verified against post-logs (for TV/radio) and post-launch delivery-verification reports for other paid media submitted to you or entities working on your behalf or at your direction from an accredited source; and

18. An overall assessment of how the marketing of the tobacco products continues to be appropriate for the protection of public health.

The products subject to these marketing granted orders are subject to withdrawal or temporary suspension as described in section 910(d) of the FD&C Act. Grounds that FDA will consider for withdrawal under section 910(d) of the FD&C Act include scenarios in which FDA finds that the continued marketing of the product is no longer APPH. These scenarios may include, but are not limited to, certain changes in product use behaviors that were not expected in FDA's assessment of the PMTA (e.g., increases in the percentage or number of youth and young adults who report use of your products, fewer users of potentially more harmful products switching to your products than anticipated), changes in FDA's understanding of the net effects of your products on the population as a whole, or new scientific evidence that demonstrates that the products present a greater risk to health than FDA understood during the review process.

## II.  Serious and Unexpected Adverse Experiences Reporting and Reporting of Certain Manufacturing Deviations

Under section 910(f) of the FD&C Act, these orders require that you report to the FDA all adverse experiences that are both serious <u>and</u> unexpected and your analysis of the association between the adverse experience and each new tobacco product **within 15 calendar days** after the report is received by you. These experiences may become known to you through any source including a customer complaint, request, or suggestion made as a result of an adverse experience, a manufacturing deviation analysis, tobacco product defect, or failure reported to you; or identified in the literature or media. Your information should be submitted with a cover letter that includes the following subject line: **SERIOUS UNEXPECTED ADVERSE EXPERIENCE REPORT for PM0000635, PM0000636, PM0000646, PM0000712, PM0004287, PM0004293**.

For purposes of reporting under these  orders, <u>serious adverse experience</u> means an adverse experience that results in any of the following outcomes:

- Death;
- A life-threatening condition or illness;
- Inpatient hospitalization or prolongation of existing hospitalization;
- A persistent or significant incapacity or substantial disruption in the ability to conduct normal life functions;
- A congenital anomaly/birth defect; or
- Any other adverse experience that, based upon appropriate medical judgment, may jeopardize the health of a person, and may require medical or surgical intervention to prevent one of the other outcomes listed in this definition.

For purposes of reporting under these orders, <u>unexpected adverse experience</u> means an adverse experience occurring in one or more persons in which the nature, severity, or frequency of the experience is not consistent with:

- The known or foreseeable risks of adverse experiences associated with the use or exposure to each tobacco product as described in the PMTA and other relevant sources of information, such as postmarket reports and studies;
- The expected natural progression of any underlying disease, disorder, or condition of the persons(s) experiencing the adverse experience and the person's predisposing risk factor profile for the adverse experience; or
- The results of nonclinical laboratory studies.

For products that have been distributed, if a manufacturing deviation occurs that you determine presents a reasonable probability that the tobacco product contains a manufacturing or other defect not ordinarily contained in tobacco products on the market that would cause serious, adverse health consequences or death you are required to report the deviation to FDA within 15 calendar days of identification.

### III. Notifications

Under sections 910(c)(1)(B) and 910(f) of the FD&C Act, these  orders also require that, as of the authorization date of your marketing granted orders, you submit the following notifications of your marketing plans and materials to FDA. This requirement to submit the product's labeling, advertising, marketing, and promotional materials and plans in advance of their use is not for pre-approval – that is, FDA is not requiring that it review and approve such materials or plans before they may be used. Rather, such advance notification will provide FDA timely access to such materials and plans and, if needed, allow FDA to provide advisory comments, including any concerns about their possible impact on youth appeal and tobacco use initiation. You may begin disseminating the materials 30 days after providing notification to FDA.

These notifications must be received by FDA **at least 30 days** prior to dissemination, which includes but is not limited to the publication, dissemination to consumers, or use in engaging or communicating with consumers of such materials. The duration of these notification requirements is as follows:

- On an ongoing basis, please provide notification of any labeling, advertising, marketing or promotion in broadcast, satellite, or cable TV media or broadcast or satellite radio media; and
- For a period of six months starting with the initial dissemination of the materials, provide notification of all other labeling, advertising, marketing, and/or promotion.

Each 30-day notification must include:

1. A single submission with a cover letter that includes the following subject line: **30-DAY NOTIFICATION for PM0000635, PM0000636, PM0000646, PM0000712, PM0004287, PM0004293.** The cover letter should include the STN(s) and corresponding tobacco product name(s), applicant name, date of notification, and planned dissemination date;

2. Full-color copies of all such labeling, advertising, marketing, and promotional materials for the products. The materials must be legible, include all panels where applicable (e.g., print ads, point of sale signs) and reflect the actual size and colors used. For any materials that would not fit on an 8.5" x 11" piece of paper, you may resize and submit electronic versions of such materials in a format that FDA can review and with sufficient resolution to allow FDA to read all

lettering clearly. If resizing the advertisement does not allow for text to be read easily, the complete text must be provided separately and clearly referenced; and

3. All advertising and marketing plans, including strategic creative briefs and paid media plans, by channel and by product, and the details, dollar amount(s) and flighting of such plans, by channel and by product, including any plans to:

   a. Use competent and reliable data sources, methodologies, and technologies to establish, maintain, and monitor highly targeted advertising and marketing plans and media buys, including a list of all data sources used to target advertising and marketing plans and media buys;

   b. Targeting specific group(s) by age-range(s), including young adults, ages 21-24, and other demographic or psychographic characteristics that reflect your intended audience, including the source(s) of such data;

   c. With respect to individuals below the federal minimum age of sale of tobacco products, actions taken to restrict access and exposure to the products' labeling, advertising, marketing, and/or promotion;

   d. Use owned, earned, shared, or paid media to create labeling for, advertise, market, and/or promote the products;

   e. Use broadcast, satellite, or cable TV media, or broadcast or satellite radio media, including copies of media buy schedules pre-launch, program lists, projected percent audience compositions by age breakouts (i.e., 21+, 2-11, 12-17, 18-24, 25-54, 55+) by program, projected audience indices by age breakouts (i.e., 21+, 2-11, 12-17, 18-24, 25-54, 55+) by program, reach and frequency goals, and any other targeting or purchasing parameters;

   f. Use partners, influencers, bloggers, or brand ambassadors to create labeling for, advertise, market, and/or promote the products;

   g. Conduct consumer engagements – whether by you, on your behalf, or at your direction – including events at which the products will be demonstrated and how access will be restricted to individuals at or above the federal minimum age of sale of tobacco products; or

   h. Use public-relations or other communications outreach to create labeling for, advertise, market, and/or promote the products.

**Appendix D**
Marketing Restrictions

Under section 910(c)(1)(B) of the FD&C Act, these  orders require you to:

- For any **digital sales** – whether conducted by you, on your behalf, or at your direction – establish, maintain, and monitor use of independent age- and identity-verification service(s) that compare customer information against independent, competent, and reliable data sources, such as public records, to prevent the sale of the products to individuals who are under the federal minimum age of sale of tobacco products.

- For any of the products' labeling, advertising, marketing, and/or promotion appearing in your **owned digital properties** (e.g., your company-owned, consumer-directed, product-branded website(s) and/or mobile applications) – whether conducted by you, on your behalf, or at your direction – establish, maintain, and monitor use of independent age- and identity-verification service(s) that compare customer information against independent, competent, and reliable data sources, such as public records, at the first point of access to such properties, to restrict access to such labeling, advertising, marketing, and/or promotion to only individuals who are at or above the federal minimum age of sale of tobacco products.

- For any of the products' labeling, advertising, marketing, and/or promotion appearing in any **shared digital properties** (e.g., your product-branded social media accounts, pages and associated content; content promoting your products on your behalf disseminated through another entity's social media accounts) – whether conducted by you, on your behalf, or at your direction – establish, maintain, and monitor use of the available site-, platform- and content- (e.g., post, video) specific age-restriction controls (e.g., age-restrict an entire product-branded account and all associated content disseminated through such account; ensure age-restriction of a specific video disseminated by an influencer promoting the products on your behalf through the influencer's account), at the first point of access to such properties, to restrict access to such labeling, advertising, marketing, and/or such promotion to only individuals who are at or above the federal minimum age of sale of tobacco products.

- For any of the products' labeling, advertising, marketing, and/or promotion appearing in **paid digital media** (e.g., paid digital banner advertisements for the products  running on another company's website; paid advertising for the products  running in social media; paid distribution of influencer content; paid advertising in streaming/Over-The-Top video programming; paid advertising in streaming/internet radio content) – whether conducted by you, on your behalf, or at your direction:

  - Establish, maintain, and monitor use of competent and reliable data sources, methodologies, and technologies to precisely target delivery of such labeling, advertising, marketing, and/or promotion to only individuals who are at or above the federal minimum age of sale of tobacco products. Such targeting must use only first- and/or second-party age-verified data, where:

    - "First-party" age-verified data is data owned by you (e.g., your customer registration data collected via site traffic to your company-owned website; data you use in direct

**A79**

marketing to your adult smoking customers) that you have age-verified through independent, competent, and reliable data sources; and

- "Second-party" age-verified data is first-party data owned and age-verified by another competent and reliable entity (e.g., another company's first-party user registration data) to which you have access. Such data must be age-verified by the second party.

- "First-party" and "second-party" data does not include data obtained from data aggregators who categorize consumers based on trackable activities and inferred interests (e.g., internet search terms, video interactions, browsing history, purchasing behaviors) to create demographic and psychographic profiles marketers may use to enhance audience targeting. Such data is not considered age-verified and can only be used in combination with first- and/or second-party age-verified data.

- For any of the products' labeling, advertising, marketing, and/or promotion appearing **in broadcast, satellite, or cable TV media, and/or broadcast or satellite radio media** (e.g., video advertisements for the products airing during broadcast cable television programming; audio advertisements for the products airing through radio media channels; ads airing via multichannel video programming distributors; ads airing during Video on Demand/Full Episode Player extensions to network buys; addressable TV ads) – whether conducted by you, on your behalf, or at your direction:

  o Establish, maintain, and monitor use of independent, competent, and reliable data sources, methodologies, and technologies to target delivery of such labeling, advertising, marketing, and/or promotion to individuals who are at or above the federal minimum age of sale of tobacco products. Such targeting must adhere to the following requirements, at a minimum:

    - All TV and radio programs must have reported audience compositions of 85% or more adults who are at or above the federal minimum age of sale of tobacco products;

    - All TV and radio programs must have reported audience indices of 99 or lower for youth aged 2-11; and

    - All TV and radio programs must have reported audience indices of 99 or lower for youth aged 12-17.

- Establish, maintain, and monitor use of competent and reliable data sources, methodologies, and technologies (e.g., using an embedded tracking pixel in all digital advertising) – whether conducted by you, on your behalf, or at your direction – to **track and measure actual delivery of all advertising impressions**, by channel, by product, and by audience demographics (e.g., age, gender, race/ethnicity, geographic region). Such monitoring requires real-time digital media tracking, and identifying, correcting, and preventing delivery of advertising impressions to individuals under the federal minimum age of sale of tobacco products. Such monitoring also requires post-logs that verify TV/radio ads fan within the approved parameters and post-launch delivery verification reports for other paid media be submitted to you or entities working on your behalf or at your direction from an accredited source.

**A80**

- For any use of **partners, influencers, bloggers, and/or brand ambassadors** to create labeling for, advertise, market, and/or promote the products – whether conducted by you, on your behalf, or at your direction – disclose to consumers or viewers, via the use of statements such as "sponsored by [firm name]" in such labeling, advertising, marketing, and/or promotional materials, any relationships between you and entities that create labeling for, advertise, market, and/or promote the products, on your behalf, or at your direction.

The marketing restrictions in these orders were determined based on review of the information submitted in your PMTAs, including information about how you intend to advertise and market the products, and in consideration of other marketing restrictions that currently apply to and/or affect the marketing of your products, including policies and practices of media entities (e.g., no broadcast TV network currently accepts tobacco advertising). Any change in the policies or practices of media entities that has the effect of expanding opportunities for manufacturers of tobacco products to reach youth and any subsequent changes in your use of such media entities may, in turn, affect the APPH analysis of your products, based on our obligation to consider how products are likely to be used, including by youth.

**A81**

# TAB 9
Ex. E to Decl. of Christopher Junker,
Marketing Denial Order for Menthol-
Flavored Vuse Vibe and Ciro
(Jan. 24, 2023)

U.S. FOOD & DRUG ADMINISTRATION

10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

January 24, 2023

**DENIAL**

R.J. Reynolds Vapor Company
Attention:  Aaron P. Williams, Ph.D.
Senior Vice President, Scientific & Regulatory Affairs
RAI Services Company
401 North Main Street
Winston-Salem, NC 27101

**FDA Submission Tracking Numbers (STNs):** Multiple STNs, see Appendix A

Dear Dr. Williams:

We completed substantive scientific review of your PMTAs[1] and are denying issuance of marketing granted orders for the tobacco products identified in Appendix A. Refer to Appendix B for a list of amendments received in support of your applications.

**The statute places the burden on the applicant to make the required showing by providing that FDA "shall deny an application" for a product to receive a PMTA marketing authorization if, "upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product," FDA finds that "there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health" (APPH). Section 910(c)(2)(A). Based on our review of your PMTAs, we determined that the applications for the new tobacco products, as described in your applications and specified in Appendix A, lack sufficient evidence to demonstrate that permitting the marketing of the products subject to these applications are APPH. You cannot introduce or deliver for introduction these products into interstate commerce in the United States. Doing so is a prohibited act under section 301(a) of the FD&C Act, the violation of which could result in enforcement action by FDA.**

You may submit new applications or a resubmission for the products that are subject to this marketing denial order. A resubmission to address the deficiency set out below would be appropriate and facilitate an efficient review. Note that a resubmission is subject to all the requirements set forth in § 1114.17 of the "Premarket Tobacco Product Applications and Recordkeeping Requirements" rule ("PMTA rule"). If you choose to submit a resubmission for these products, you must fulfill all requirements set forth in section 910(b) of the FD&C Act and 21 CFR Part 1114. To do so, you may cross-reference information submitted in:

- The new tobacco product applications, PM0000637.PD1 and PM0000713.PD1, subject to this Denial (see 21 CFR 1114.17)

---

[1] Premarket Tobacco Product Applications (PMTAs) submitted under section 910 of the Federal Food, Drug, and Cosmetic Act (FD&C Act).

- A Tobacco Product Master File submission (see 21 CFR 1114.7(b)(2) or 1114.17(c)(2); and guidelines at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/tobacco-product-master-files)

A resubmission should be clearly identified as such and include all information necessary to respond to the deficiency identified in this letter (see 21 CFR 1114.17(c) and (d)). If you decide to resubmit and cross-reference these PMTAs, in addition to evaluating your response to the listed deficiency, FDA will assess your resubmission to determine whether it meets the requirements of the PMTA rule and whether the application as a whole supports a finding that the marketing of your product(s) is appropriate for the protection of the public health.

Please note, the deficiency identified in this letter is not necessarily the sole deficiency in your applications. We found that the deficiency identified below is dispositive of your applications because it precludes a finding that permitting the marketing of your new tobacco products is APPH. Accordingly, although FDA has reviewed your applications from a toxicology perspective, FDA has not reached final conclusions about the overall toxicological profile of the new products.

We provide the following basis for our determination:

Your PMTAs lack sufficient evidence demonstrating that the new products have a potential to benefit adult smokers in terms of complete switching or significant cigarette use reduction to a degree that would outweigh the risk to youth.

There is substantial evidence that the use of menthol flavors in tobacco products, like the menthol flavors in the new products, has significant appeal to youth and is associated with youth initiation of such products. The marketing restrictions and other mitigation measures that you proposed cannot mitigate these risks to youth sufficiently to reduce the magnitude of adult benefit required to demonstrate that marketing of these products would be APPH. In light of the known risks to youth of marketing flavored ENDS (including menthol flavor), robust and reliable evidence is needed regarding the magnitude of the potential benefit to adult smokers. This evidence could have been provided using a randomized controlled trial, longitudinal cohort study, or other evidence demonstrating the benefit of the new products to adult smokers relative to tobacco-flavored ENDS products. Such evidence should include an appropriate comparator tobacco-flavored ENDS. Reliable and robust data are needed to evaluate the impact of the new products compared to tobacco-flavored products on adult smokers' complete switching or significant reduction in cigarette use over time because tobacco-flavored products have not been shown to present the same risks to youth as tobacco products with other characterizing flavors. Whether other products give adult smokers comparable options for complete switching or significant cigarette reduction bears on the extent of the public health benefit that the new products arguably provide to that population. Moreover, although this evidence is necessary to demonstrate that the subject ENDS provide benefits for adult smokers, it may not be sufficient to demonstrate that the marketing of the subject ENDS is appropriate for the protection of the public health: having established the benefit to adults, applications containing this evidence would still be evaluated to determine that the totality of the evidence supports a marketing authorization.

Based on the information that you provided, there is a lack of evidence to demonstrate that the subject ENDS, relative to tobacco-flavored ENDS, would provide an added benefit for adult

smokers that is adequate to outweigh the substantial risks to youth. You submitted findings from longitudinal cohort studies to show that use of ENDS may facilitate switching in adult smokers; however, these studies were not brand- or product-specific, and thus did not demonstrate that your menthol-flavored new products are more likely to promote complete switching or significant cigarette reduction compared to tobacco-flavored products. You also submitted cross-sectional studies showing a positive association between being a former combustible cigarette (CC) smoker (versus current smoker) and use of your flavored (including menthol) ENDS products. However, based on the cross-sectional data provided, it cannot be determined whether these former smokers used menthol-flavored ENDS products to quit cigarette smoking or started using ENDS products after they quit smoking. Furthermore, your PMTAs do not contain evidence from a randomized controlled trial or other evidence regarding the impact of the subject ENDS on complete switching or significant cigarette reduction that could demonstrate the benefit of these products over tobacco-flavored ENDS.

Your PMTAs also cited several published studies examining the role of menthol-flavored ENDS on switching and smoking cessation. Although these studies provided relevant information on the extent to which flavored ENDS products, as a category, may facilitate switching, the published literature on the role of menthol-flavored ENDS and smoking cessation or reduction is limited and does not demonstrate that menthol-flavored ENDS are more effective in promoting complete switching or significant cigarette reduction relative to tobacco-flavored ENDS. Additionally, the PMTAs did not provide adequate information to bridge the findings in the literature to the subject ENDS, and you did not provide adequate product specific information to evaluate the likelihood that current tobacco users, and in particular adult CC smokers, will completely switch to the subject ENDS or significantly reduce cigarette smoking to a greater extent than they would with tobacco-flavored ENDS.

Thus, based on your applicant-sponsored studies and the peer-reviewed studies in the literature, FDA is unable to determine whether or to what extent your menthol-flavored new products facilitate complete switching or significant cigarette reduction compared to tobacco-flavored ENDS products. Given the known risks to youth of marketing flavored ENDS, this information is needed to demonstrate that your menthol-flavored new products would provide a benefit to adult smokers sufficient to outweigh their risk to youth.

Because you have not met your burden of "showing" that permitting the marketing of the new products would be APPH as required by Section 910(c)(2)(A), we must deny authorization for your applications.

We encourage you to submit all regulatory correspondence electronically via the CTP Portal[2,3] using eSubmitter.[4] Alternatively, submissions may be mailed to:

> Food and Drug Administration
> Center for Tobacco Products
> Document Control Center (DCC)
> Building 71, Room G335
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993-0002

The CTP Portal and FDA's Electronic Submission Gateway (ESG) are generally available 24 hours a day, seven days a week; submissions are considered received by DCC on the day of successful upload. Submissions delivered to DCC by courier or physical mail will be considered timely if received during delivery hours on or before the due date[5]; if the due date falls on a weekend or holiday, the delivery must be received on or before the preceding business day. We are unable to accept regulatory submissions by e-mail.

If you have any questions, please contact Sequoia Bacon, Regulatory Health Project Manager, at (301) 796-0736 or Sequoia.Bacon@fda.hhs.gov.

> Sincerely,
>
> Digitally signed by Benjamin
> Apelberg -S
> Date: 2023.01.24 08:14:34 -05'00'
>
> Benjamin Apelberg, Ph.D.
> Acting Director
> Office of Science
> Center for Tobacco Products

Enclosures:
> Appendix A – New Tobacco Products Subject of This Letter
> Appendix B – Amendments Received for These Applications

---

[2] For more information about CTP Portal, see
https://www.fda.gov/tobacco-products/manufacturing/submit-documents-ctp-portal
[3] FDA's Electronic Submission Gateway (ESG) is still available as an alternative to the CTP Portal.
[4] For more information about eSubmitter, see https://www.fda.gov/industry/fda-esubmitter
[5] https://www.fda.gov/tobacco-products/about-center-tobacco-products-ctp/contact-ctp

**Appendix A[6,7]**

New Tobacco Products Subject to This Letter

| Common Attributes | |
|---|---|
| Applicant | R.J. Reynolds Vapor Company |
| Product manufacturer | R.J. Reynolds Vapor Company |
| Product category | ENDS (VAPES) |
| Product subcategory | Closed E-Liquid |
| **Attributes** | **New Product** |
| **STN** | **PM0000637.PD1** |
| Submission date | April 2, 2020 |
| Receipt date | April 2, 2020 |
| Product name | Vuse Vibe Tank Menthol 3.0% |
| Package type | Paperboard Carton/Blister Pack |
| Package quantity | 2 Cartridges |
| Characterizing flavor (CF) | Menthol |
| Nicotine source | Tobacco |
| E-liquid volume | 1.9 milliliter (ml) per cartridge |
| Nicotine concentration | 35.5 milligram/milliliter (mg/ml) |
| PG/VG ratio | 26/74 |
| Diameter | 13.0 millimeter (mm) |
| Length | 59.0 mm |
| Additional property | Nicotine content: 3.0% weight per weight (w/w) |
| **STN** | **PM0000713.PD1** |
| Submission date | April 15, 2020 |
| Receipt date | April 15, 2020 |
| Product name | Vuse Ciro Cartridge Menthol 1.5% |
| Package type | Paperboard Carton/Blister Pack |
| Package quantity | 3 Cartridges |
| Characterizing flavor (CF) | Menthol |
| Nicotine source | Tobacco |
| E-liquid volume | 0.9 ml |
| Nicotine concentration | 17.7 mg/ml |
| PG/VG ratio | 30/70 |
| Diameter | 9.2 mm |
| Length | 50.0 mm |
| Additional property | Nicotine content: 1.5% w/w |

---

[6] Brand/sub-brand or other commercial name used in commercial distribution.

[7] Effective April 14, 2022, FDA's authority to regulate tobacco products was extended to include tobacco products containing nicotine from any source. As such, nicotine source is considered a required property for unique identification.

https://www.congress.gov/bill/117th-congress/house-bill/2471

**Appendix B**
Amendments Received for These Applications

| Submission Date | Receipt Date | Applications being amended | Reviewed | Brief Description |
|---|---|---|---|---|
| November 23, 2020 | November 23, 2020 | All | Yes | Response to the Office of Compliance and Enforcement's November 9, 2020, Inspection Request Letter |
| February 18, 2021 | February 18, 2021 | All | Yes | Request for extension to Respond to December 18, 2020, FDA Deficiency Letter |
| March 18, 2021 | March 18, 2021 | All | Yes | Response to December 18, 2020, FDA Deficiency Letter |

# TAB 10

Ex. F to Decl. of Christopher Junker,
Excerpt of Technical Project Lead
Memorandum related to January 24,
2023 Marketing Denial Order

# Technical Project Lead § 1.2

Finally, before determining that permitting the marketing of a tobacco product would be APPH, FDA also takes into account whether the applicant has provided sufficient information regarding product design, chemistry, stability, manufacturing controls including process controls and quality assurance procedures, toxicology, abuse liability, and other factors that can impact the product's risks and benefits to individual users, including relative to those of other tobacco products on the market.

## 1.2. SUBJECT APPLICATIONS

FDA's evaluation of these PMTAs determined that the applicant failed to demonstrate that the new products have a potential benefit to adult smokers who switch completely or significantly reduce their CC use that would outweigh the products' risk to youth. For flavored ENDS, existing evidence demonstrates that the known and substantial risk to youth in particular is high. As discussed below, flavored ENDS may pose greater addiction risk relative to tobacco-flavored ENDS, which increases concerns of addiction in youth. There is also a known and substantial risk of flavored ENDS with respect to youth appeal, uptake, and use.

The PMTAs provide insufficient evidence to diminish or dispel those risks in connection with the new products. The applicant did not propose any novel or materially different marketing restrictions or other mitigation measures from those that FDA has previously considered and found insufficient to mitigate the substantial risk to youth from flavored ENDS sufficiently to reduce the magnitude of adult benefit required to show APPH. Thus, the new products could be appropriate for the protection of the public health only if the PMTAs present reliable and robust evidence of a potential benefit to adult smokers completely switching from or significantly reducing CC that could outweigh that risk to youth. To effectively demonstrate this benefit in terms of product use behavior, the PMTAs would likely need to provide product-specific evidence[v] from a randomized controlled trial (RCT)[vi] or longitudinal cohort study,[vii] although FDA evaluates other types of evidence on a case-by-case basis to determine if it is sufficiently reliable and robust to make the necessary showing. Moreover, tobacco-flavored ENDS may offer the same type of public health benefit claimed by flavored ENDS, i.e., increased complete switching and/or significant reduction in CC smoking without posing the same degree of risk of youth uptake. Therefore, to evaluate the potential benefit to current users, FDA reviewed the PMTAs for any acceptably strong evidence that the flavored new products have an added benefit relative to that of tobacco-flavored ENDS in facilitating adult smokers' ability to completely switch away from or significantly reduce their CC smoking.

We have reviewed the subject applications to determine whether they contain sufficient evidence of the type described above to demonstrate APPH. While the PMTAs did contain findings from four RCTs and four longitudinal cohort studies, none of these studies contain evidence regarding the

---

[v] Product-specific evidence is derived from or based on studies using the specific new products that are the subject of the applications.

[vi] A randomized controlled trial is a clinical investigation or a clinical study in which human subject(s) are prospectively and randomly assigned to one or more interventions (or no intervention) to evaluate the effect(s) of the intervention(s) on behavioral, biomedical, or health-related outcomes. Control or controlled means, with respect to a clinical trial, that data collected on human subjects in the clinical trial will be compared to concurrently collected data or to non-concurrently collected data (e.g., historical controls, including a human subject's own baseline data), as reflected in the pre-specified primary or secondary outcome measures.

[vii] A longitudinal cohort study is an observational study in which human subjects from a defined population are examined prospectively over a period of time to assess an outcome or set of outcomes among study groups defined by a common characteristic (e.g., smoking cessation among users of non-tobacco flavored ENDS compared with users of tobacco-flavored ENDS). The term cohort study may also be used interchangeably with longitudinal cohort study.

impact of the subject ENDS on switching or cigarette reduction, and therefore do not demonstrate an added benefit of the applicant's products for adult users compared to tobacco-flavored ENDS. In particular, the longitudinal cohort studies' findings were not specific to the applicant's products under review and did not assess the impact of menthol-flavored ENDS or other flavored varieties of ENDS on cigarette smoking switching behavior. Similarly, the applicant's RCTs did not assess the impact of the applicant's menthol-flavored ENDS or other flavored varieties of ENDS on cigarette smoking switching behavior. The other evidence provided in the PMTAs regarding the potential benefit to adult users is not adequate to make the required showing. The applicant provided data from two consumer perception and intention cross-sectional studies. However, these studies evaluated overall brand perceptions and intentions, not specific flavors, and they did not assess complete switching or significant cigarette reduction over time (see section 3.4 for details).

Based on the information provided in the PMTAs and the available evidence, the PMTAs lack sufficient evidence to show that the new products have the potential to benefit adult smokers who switch completely or significantly reduce their CC use to an extent that would outweigh the risk to youth.

## 2. BACKGROUND

### 2.1. NEW PRODUCTS

The applicant submitted information for the two new tobacco products listed on the cover page and with more detail in the Appendix, sold under the brand names Vuse Vibe and Vuse Ciro. Briefly, a complete Vuse Vibe or Vuse Ciro ENDS is composed of a rechargeable Power Unit (device)[viii], a prefilled replacement cartridge containing the e-liquids, and an accessory USB charger for the power unit. The power unit and cartridge settings are not adjustable by the user. One Vuse Vibe product is subject to this review: PM0000637, Vuse Vibe Tank Menthol 3%. One Vuse Ciro product is subject to this review: PM0000713, Vuse Ciro Cartridge Menthol[ix] 1.5%.

### 2.2. REGULATORY ACTIVITY

On April 2, 2020 and April 15, 2020, FDA received two PMTAs from R.J. Reynolds Vapor Company. FDA issued Acceptance letters to the applicant on April 8, 2020 and April 21, 2020. FDA issued Filing letters to the applicant on April 17, 2020 and May 4, 2020. On November 9, 2020, FDA issued an Inspection Request Letter. A Deficiency letter was issued to the applicant on December 18, 2020. FDA issued a Correction Letter on February 17, 2021. FDA issued an Extension Denial Letter to the applicant on April 14, 2021.

Refer to the Appendix for a complete list of amendments received by FDA.

### 2.3. SCOPE OF REVIEW

This review captures all compliance and scientific reviews completed for the new products subject to this review.

---

[viii] PM0000635, PM0000646, PM0004287, and PM0004293 are not subject to this TPL review.

# Technical Project Lead § 3.4.1.5

### 3.4.1.4. Vulnerable populations[xv] (other than youth)

Per the BCP review:

- ███████████████████████████████████████████ Vulnerable populations have increased difficulties with smoking cessation.[33-35] ENDS may serve as a harm reduction approach if users are able to completely switch or dramatically reduce combusted tobacco product use. ████████████████████████████████████

Per the epidemiology review:

- Some published literature has found that the use and initiation of ENDS is higher among lesbian, gay, bisexual, and transgender (LGBT) youth and adults, people with a history of mental health problems, and American Indian/Alaskan Natives.[36-41] ████

Per the social science review:

- ████████████████████████████████████████

- Published research indicates that individuals with substance use or mental health issues are more likely to use ENDS compared to those without those health concerns.[40,42-45] Additionally, the prevalence of ENDS use by lesbian, gay, and bisexual individuals is higher than in heterosexual individuals.[36,46-48] Younger women and women who use CC may use ENDS during pregnancy.[49-51]

- ███████████████████████████████████████ Data on vulnerable populations are not required for this application. Thus, the information submitted by the applicant is acceptable from the social science perspective.

### 3.4.1.5. Actions taken to mitigate risk to non-users including youth

- Before determining that permitting the marketing of a new tobacco product would be APPH, FDA considers the impact of marketing restrictions and other mitigation efforts that aim to reduce the risk of youth initiation and tobacco use. Marketing restrictions include advertising and promotion restrictions intended to limit youth exposure to and appeal of tobacco product marketing (measures such as limiting advertising to platforms that are predominantly used by adults and using advertising content and methods that are not known to resonate with youth, or even eliminating advertising in certain media channels altogether) and sales access restrictions intended to restrict youth access to tobacco products (measures such as selling products only in face-to-face interactions, in adult-only facilities, or via

---

[xv] This term refers to groups that are susceptible to tobacco product risk and harm due to disproportionate rates of tobacco product initiation, use, burden of tobacco-related diseases, or decreased cessation.

websites that require robust age verification). In recent years, there have been efforts to develop novel and potentially more effective mitigation measures aimed at reducing youth initiation risks, such as device access restrictions (e.g., technologies that require adult user identification by fingerprint or other biometric parameters in order to unlock and use a tobacco product). FDA evaluates these measures in the context of the overall public health evaluation of the product, weighing the known risks to youth against the benefit to adults. For example, as discussed in section 3.4.2 below, in the case of flavored ENDS, the risk of youth initiation and use is well-documented and substantial and thus more stringent restrictions are needed in order to meaningfully mitigate that risk.

Restrictions on advertising and promotion include measures such as:  limiting advertising in various media channels like point-of-sale, print, TV, radio, digital media such as Internet websites, mobile applications, social media platforms like Facebook, Twitter, Instagram (e.g., placing advertising only in media with audience compositions of at least 85% adults 21+; limiting social media promotion to only platforms with age-gating controls; not advertising on billboards located within 500 feet of any elementary or secondary schools, youth-oriented facilities, childcare facilities, or hospitals; requiring point-of-sale advertising be placed only in areas of the facility that cannot be seen outside); limiting the timing, frequency, or overall amount of advertising (e.g., advertising on TV and radio only during certain hours; airing no more than one advertisement per half hour of programming with a minimum 20-minute separation between spots); limiting the use of certain advertising and promotional tactics (e.g., sending direct e-mail communication to only age-verified customers who have opted to receive such content; avoiding the use of direct mail advertising; avoiding use of influencers; avoiding use of product giveaways and product samples; avoiding use of sponsorships and events); developing advertising content that is intended to appeal to adults and avoid themes and images known to resonate with youth (e.g., avoiding use of cartoons; avoiding use of content depicting youth culture or lifestyle appeal; avoiding use of user-generated social media content featuring underage users; using only models who will be and appear to be ages 25+ in advertising); and utilizing product labeling and packaging designs intended to reduce youth appeal (e.g., avoiding use of confectionary or candy-like naming conventions or images; limiting use of colors and imagery, using only black and white labels). The purpose of these restrictions is to reduce youth exposure to and appeal of tobacco product images, which in turn reduces product appeal among youth, which in turn reduces the desire to buy and/or try products, which in turn reduces the likelihood of youth initiation and youth use.  Because these restrictions are intended to curb youth appeal but do not directly prevent youth use, they do not provide enough assurance of a sufficient reduction in youth use to mitigate the substantial risk that flavored ENDS pose to youth, a risk that is supported by direct, robust and reliable data of behavioral outcomes (e.g., actual youth initiation rates and youth use rates).  Accordingly, for flavored ENDS, these promotion and advertising restrictions do not have the potential to reduce the magnitude of adult benefit required to establish APPH. In other words, for flavored ENDS, these promotion and advertising restrictions do not reduce the risk of youth initiation and use to a sufficient degree that FDA could find

that a product is APPH in the absence of robust evidence of a countervailing benefit to adults.

Restrictions on sales access include measures such as: complying with local, state, and federal minimum age of sale restrictions; requiring age- and identity-verification prior to selling products online; utilizing independent and reliable age- and identity-verification services; selling products only in face-to-face interactions; selling products only in adult-only facilities; using trace and verify QR codes linked to the purchaser's driver's license; setting limits on the number of products that can be purchased in a single transaction; requiring retailers and distributors to sign written agreements stating they will cooperate with "secret shopper" programs and audits; penalizing retailers and distributors for underage sales; conducting retailer training programs; participating in responsible retailing programs (e.g., We Card); and monitoring distribution channels for compliance. These measures tend to be more direct than advertising and promotion restrictions in that they are intended to curtail access to products. However, FDA has found that to date these restrictions do not mitigate the high risk to youth posed by flavored ENDS to a degree sufficient to establish that a product is APPH in the absence of robust and reliable evidence of benefit to adults. This is because youth have been able to obtain products, including flavored ENDS, despite sales restrictions.

As FDA explained in the 2020 Enforcement Priorities Guidance, from April 2018 to August 2019, the agency sent more than 6,000 warning letters to and filed more than 1,000 civil money penalty complaints against online and brick-and-mortar retailers for illegal sales of e-cigarettes to minors (FDA, 2020). FDA also asked manufacturers to propose measures they could implement to help restrict youth access to e-cigarettes (FDA, 2020). The proposed measures included the use of age-verification technology for online sales, enhanced monitoring of retailer compliance with age-verification requirements, and contractual penalties for retailers that fail to comply with sales restrictions (FDA, 2020).

Youth continue to be able to access e-cigarettes, despite legal prohibitions and voluntary actions by some manufacturers (FDA, 2020). This is due in substantial part to the fact that the majority of youth do not purchase e-cigarettes themselves from retail locations but rather obtain them from social sources, such as obtaining them from friends or family members, stealing them, or using someone else's product.[24,52-54] In addition, with respect to youth who do attempt to purchase e-cigarettes themselves, one study  found that some e-cigarette users ages <18 reported having last obtained e-cigarettes from adult-only locations or those that should have had age verification procedures in place (i.e., smoke shops, liquor stores).[53] Only one-quarter of youth who tried to buy tobacco products were refused sale because of their age.[52]

Therefore, FDA has found to date that these sales access restrictions do not provide enough assurance of a sufficient reduction in youth use to mitigate the substantial risk flavored ENDS pose to youth. Accordingly, for flavored ENDS, these sales access

restrictions do not have the independent potential to reduce the magnitude of adult benefit needed to show APPH.

In contrast, in recent years there have been efforts to develop novel and potentially more effective mitigation measures such as device access restrictions. These include implementation of device technologies, such as age-gating technologies that require user identification by fingerprint or other biometric parameters in order to unlock and use a tobacco product or geo-fencing technologies (e.g., technologies that make it impossible to operate a tobacco product in a particular location such as a school or playground). In contrast to the advertising and promotion and sales access restrictions discussed above, FDA believes that these novel device access technologies may have the potential to sufficiently mitigate the risk to youth if they can be shown to restrict product access in a way that cannot be disabled or defeated. The use of device access restrictions in the current marketplace is limited, and FDA continues to assess them.

In conclusion, before determining that permitting the marketing of a new tobacco product would be APPH, FDA considers the impact of marketing restrictions and other mitigation efforts that aim to reduce the risk of youth initiation and tobacco use. FDA evaluates these measures in the context of the overall public health evaluation of the product, weighing the known risks to youth against the possible benefit to adults. The assessment for flavored ENDS is different from other tobacco products because of (1) the substantial risk of youth initiation and youth use as shown by well-established data, and (2) the lack of robust evidence in the scientific literature regarding the potential of flavored ENDS to benefit adult smokers, particularly when compared to alternatives posing less risk to youth, such as tobacco-flavored ENDS. Given those considerations, as well as the information discussed above regarding advertising, promotion, and sales access restrictions, we have thus far determined that restrictions on advertising and promotion and sales access have not been adequate to mitigate the risk to youth from flavored ENDS sufficiently to reduce the magnitude of adult benefit needed to show APPH. In contrast, only the most stringent mitigation measures could provide sufficient assurance of such risk mitigation. To date, the only such measures identified with the potential for that kind of impact have been device access restrictions. Nonetheless, consistent with the concerns expressed by certain federal courts, FDA is reviewing all applicant-proposed marketing restrictions and mitigation measures to ensure that there are no other types of novel and materially different proposals.

- The applicant submitted information on its proposed marketing in two letters dated November 9, 2018, and April 29, 2019.
- OHCE reviewed the relevant marketing submissions and drafted a consult dated February, 24, 2022.
- The marketing plan information submitted by the applicant indicates that it intends to use the following measures to help reduce youth appeal of its marketing materials: "Not use any social media platforms (e.g., Facebook, Instagram, Twitter) or social media influencers for marketing and promotional purposes; No testimonials by sports figures or celebrities or any person with special appeal to

**A95**

persons under 21 years of age; No person appearing in any advertising materials shall be under age 25 or be styled to look under age 25; Content shall not include characters, images, or themes designed to target youth; Content shall not be related to youth or youth-oriented activities; Content shall not suggest that use of R.J. Reynolds Vapor Company's ("RJRV") products is essential to social prominence, distinction, success or sexual attraction, nor shall any content picture a person using any RJRV products in an exaggerated manner; and Content shall not depict persons participating in, or obviously just having participated in, a physical activity requiring stamina or athletic conditioning beyond that of normal recreation."

- The applicant proposed a few measures to limit youth exposure to the new products' marketing materials and activities, but OHCE noted that the applicant's overall marketing plan is very broad, and its proposed measures are very limited in scope. The applicant described plans to age-verify tobacco consumers opting in to receive direct mail/e-mail marketing, plans to conduct age- and identity-verification of consumers participating in engagement events, and plans to avoid use of social media platforms and influencers.
- Overall, OHCE concluded that, if the products are otherwise authorized to be marketed, the marketing granted order should include additional marketing requirements and recommendations.
- However, as TPL I find that these menthol-flavored ENDS products should not otherwise be authorized. The applicant did not propose any novel or materially different measures from those that FDA has previously considered and found insufficient. Consistent with the explanation above, I find that the applicant-proposed measures do not have the potential to mitigate the substantial risk to youth from flavored ENDS sufficiently to establish that the marketing of the new products is APPH in the absence of robust evidence of added benefit to adults compared to less risky alternatives. Thus, the marketing plans and restrictions are not sufficient to overcome the deficiency related to the lack of evidence for added benefit to adult smokers.

### 3.4.1.6. Labeling and advertising

Per the social science review:
- The applicant provided proposed labeling.
- 

- Based on the information presented at this time, we have not concluded that the proposed labeling is false or misleading in any particular.

# Technical Project Lead § 3.4.2 Excerpt



The applicant submitted longitudinal data that suggested that use of ENDS, as a general product category, may facilitate switching among adult smokers. These longitudinal studies were not brand- or flavor-specific. The applicant also submitted cross-sectional data among users of Vuse products. For example, in the NTBM survey, Vuse Vibe users who reported using a non-tobacco flavor, including menthol, had significantly higher odds of being a former vs. current cigarette smoker (OR = 1.57, 95% CI: 1.15-2.16, p=0.0048). For Vuse Solo (as a proxy for Vuse Ciro), the use of non-tobacco flavors, including menthol, was associated with a significantly higher odds of being a former smoker versus a current smoker (TTM: OR = 2.16, p<0.008, NTBM: OR = 1.97, p<0.0001). However, these analyses were cross-sectional and thus do not indicate whether the former smokers used the flavored ENDS products to quit cigarette smoking or whether they started using the ENDS products after they quit smoking. Cross-sectional surveys entail a one-time assessment of self-reported outcomes: although participants can be asked to recall their past behavior, the single data collection does not enable reliable evaluation of former smokers' behavior change over time. Moreover, the data does not show that use of the products in these PMTAs, Vuse Vibe Tank Menthol 3% and Vuse Ciro Cartridge Menthol 1.5 %, increases the likelihood of quitting or switching among adult smokers because no observational data were provided for those specific products. Consumer perception studies (surveys or experiments) typically assess outcomes believed to be precursors to behavior, such as preferences or intentions related to the new products but are not designed to directly assess actual product use behavior.[xxiii]

As TPL, after consideration of the data submitted, I find that the menthol-flavored new products have not been shown to be associated with increased complete switching or significantly reducing cigarette consumption among CC users to the extent that they would outweigh the risks of youth appeal.  The applicant did not submit evidence from an RCT or cohort study showing that its menthol-flavored ENDS provide an added benefit to adult smokers in terms of complete switching or significant cigarette reduction over tobacco-flavored ENDS. The RCTs submitted did not contain evidence regarding the impact of the subject ENDS on switching or cigarette reduction and the findings in the cohort studies were not specific to the applicant's products under review and did not assess the impact of

---

[xxiii] Though behavioral intentions can be useful to address some questions in the PMTA assessment, there are limits to their utility as a predictor of future behavior when it comes to predicting sustained behavior change, such as product switching.[64,65] Indeed, the FDA Guidance, "Principles for Designing and Conducting Tobacco Product Perception and Intention Studies" (2022) notes the importance of actual use studies when evaluating patterns of use such as switching: "However, whereas a [Tobacco Product Perception and Intention] study may address how a participant intends to use the product, participants may have limited ability to forecast their future patterns of use behavior. Accordingly, patterns of use may be better assessed with data from behavioral studies, including actual use studies. For instance, behavioral study data can address a tobacco user's likelihood of completely switching to the new product and quitting smoking cigarettes."